**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------X

STEVEN SCHWEITZER and
WILLIAM SCOTT MERO,

                 *Plaintiffs*,                      Case No. 1:22-cv-06435-RA

       -against-

                                          **AMENDED COMPLAINT**

JAMES E. NEVELS and
THE SWARTHMORE GROUP, INC.,

                 *Defendants.*

--------------------------------------------------------------X

        Plaintiffs, Steven Schweitzer ("Schweitzer") and William Scott Mero ("Mero") (collectively, the "Plaintiffs"), by and through their attorneys, as and for their Amended Complaint against Defendants, James E. Nevels ("Nevels") and The Swarthmore Group, Inc. ("Swarthmore") (collectively, the "Defendants"), hereby allege as follows:

## JURISDICTION AND VENUE

        1.      This is an action for damages in excess of $75,000 exclusive of interest, attorneys' fees and costs.

        2.      This Court has jurisdiction over Defendants pursuant to 28 U.S.C. §1332(a) as the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the statutory minimum of $75,000, exclusive of interest and costs.

        3.      Venue is proper before this Court, pursuant to 28 U.S.C. §1391 because (i) a substantial part of the events, acts, and omissions giving rise to the claims alleged herein occurred in the Southern District of New York; (ii) there is no district in which an action may otherwise be brought as provided in 28 U.S.C. §1391; and (iii) Defendants are subject to personal jurisdiction in this judicial district.

## PARTIES

Page **1** of **56**

4.    Plaintiff Steven Schweitzer is an individual who, at all relevant times, is and was, a resident of the State of New York, Westchester County.

5.    Plaintiff William Scott Mero is an individual who, at all relevant times, is and was, a resident of the State of New York, New York County.

6.    Defendant James E. Nevels is an individual who, at all relevant times, is and was, a resident of the Commonwealth of Pennsylvania.

7.    At all relevant times, Defendant the Swarthmore Group, Inc. is a corporation formed under the laws of the State of Delaware and maintains a principal place of business located in the Commonwealth of Pennsylvania, as well as conducts business on a regular basis in the State of New York.[1]

## **FACTUAL BACKGROUND**

8.     Swarthmore is a registered investment advisory firm that provides financial wealth management and investment consulting services, portfolio management for individuals, large and small businesses, institutional clients, and other related services. Swarthmore was founded by Nevels in 1991.

9.    Nevels is an individual who is the founder, Chairman, Chief Executive Officer, and largest shareholder of Swarthmore.

10.    Nevels is the sole policy-making officer and interested owner of Swarthmore. Nevels is the active decision maker for Swarthmore, actively exercised the policy-making function for Swarthmore, and is the officer responsible for dealing with, and making decisions with respect to, *inter alia*, the hiring and firing of employees, the terms of the employees' employment with

---

[1] On August 4, 2022, Swarthmore Group, Inc., filed for Chapter 7 bankruptcy in the Eastern District of Pennsylvania, Case No.: 22-12040. *See* ECF 17. As such, this action is stayed as to Swarthmore Group, Inc.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

Swarthmore, and the expenditures of corporate funds (who gets paid, how much each employee is to be paid, employees bonuses and benefits, etc.)

11.     Nevels is a highly educated and sophisticated investor with more than 40 years of experience in the securities and investment industry. Nevels, per the statements on Swarthmore's website and those he made to the Plaintiffs, is (1) on the Board of Directors of Alcoa Corporation and WestRock; (2) the Director and Chair of the board for the Business Counsel for International Understanding; (3) a member of the Federal Reserve Bank of Philadelphia Presidential Advisory Committee, OFR Financial Research Advisory Committee, and the Council on Foreign Relations; (3) Vice Chair of the board of trustees of Manor College, the Capital Partners for Education Development Committee, and the Pennsylvania Prison Society; (4) former chairman of the Philadelphia School Reform Commission; (5) former Chairman and Lead Independent Director of The Hershey Company; (6) was a member of the Board of the Hershey Trust Company, as well as many other companies and organizations; (7) a graduate of Bucknell University (cum laude and Phi Beta Kappa), The Wharton School of the University of Pennsylvania (MBA) and The University of Pennsylvania Law School (JD), and has very recently obtained a legal letters master degree (LL.M.) in Wealth Management from Texas A&M University where he is currently an adjunct professor in the Risk Management Program.

12.      Mero is an individual with over 25 years of financial and investment experience, specializing in high-yield bonds, investment grade bonds, and asset backed securities.

13.     Schweitzer is an individual with over 25 years of financial and investment experience, specializing in fixed income, credit analysis, and portfolio management on behalf of pension funds, insurance companies, endowments, foundations, and mutual funds.

14.     Schweitzer and Mero are professional acquaintances who met in the late 1990s when Mero was an analyst at Bankers Trust and Schweitzer was an analyst at Shenkman Capital Management, Inc.

15.     Mero and Schweitzer have complementary skill sets, as they both were highly experienced in the management of institutional high yield portfolios, having over 50 years of combined experience in the industry.

16.     Over the years, the Plaintiffs became friends and frequently discussed their ideas for a business plan in which the two would work together for a mutual client or asset management company.

17.     In 2020, the Plaintiffs were each unsatisfied with their then employment and they decided to pursue their idea to work together.

18.     In mid-2020, Mero contacted Michael Sarnoff, a recruiter with Diversified Search Group.

19.     Upon information and belief, Diversified Search Group was retained by the Defendants to fill executive positions at Swarthmore.

20.     Thereafter, in or about Fall 2020, Plaintiffs were approached by Sarnoff with a prospective opportunity with Swarthmore.

21.     Upon information and belief, Nevels provided Sarnoff with the employment descriptions for the executive roles he sought to fill at Swarthmore, as well as for a senior analyst position.

22.     At that time, upon information and belief, Nevels was distracted by his other obligations and engagements and was (unbeknownst to Plaintiffs at the time) dangerously disconnected from the operations and management of Swarthmore. This caused the growth of the

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

company and its profits to stall and resulted in high employee turnover and all-around poor performance.

23.    In fact, after the termination of the Plaintiffs' employment with Swarthmore without cause, the Plaintiffs became aware of the Defendants poor performance of former clients' accounts, which resulted in the loss of certain clients many years prior to their employment with Swarthmore.   Upon information and belief, such performance was a result not of market conditions, but because Nevels did not properly manage the business' operations.

24.    Upon information and belief, at that time, Nevels was on the board of directors of at least two publicly traded companies and sought to expand his roles on other boards and become a professor, which occupied much of his time and (unbeknownst to Plaintiffs at the time) prevented him from devoting sufficient and necessary time to Swarthmore.

25.    In December of 2020, Nevels engaged in further negotiations and conversations with Plaintiffs at which time Nevels relayed to Plaintiffs his idea of them becoming executives at Swarthmore.

26.    Nevels and Plaintiffs discussed Plaintiffs' roles and compensation if they would agree to join Swarthmore.

27.    During the recruitment of Plaintiffs and in his compensation presentation, Nevels offered the Plaintiffs special benefits and compensation that he did not offer other employees; including, but not limited to, guaranteed salaries, bonuses, and equity interests in the company.

28.    At that time, Nevels told the Plaintiffs that he sought a "partnership" arrangement with the Plaintiffs under an ideology that the Plaintiffs did not work for Nevels, rather the three worked together as partners.

29.    Indeed, Nevels comment was made in response to a comment from Schweitzer, during the employment negotiation process during which time, Schweitzer commented upon Plaintiffs "working for you [Nevels]" at which point Nevels stated to Plaintiff "[you] don't work for me. We are partners."

30.    In fact, from the outset of negotiations, Nevels committed to tender an equity interest in Swarthmore to the Plaintiffs if they accepted employment positions with the company.

31.    At that time, Nevels sought (and expressed to the Plaintiffs) to ultimately hand over control and management of Swarthmore to Plaintiffs, and even told them that he considered the Plaintiffs the next generation who would take the firm forward for the next 30 years and that their employment at Swarthmore would be their "final job."

32.    In his recruitment of Plaintiffs, Nevels stated to them that he had "taken his eye off the ball" when it came to the management and growth of the company because he had committed to too many other opportunities; including but not limited to board positions, other businesses and obligations that required a significant time commitment by Nevels. However, Nevels assured Plaintiffs that his focus was back with Swarthmore, his management duties to the company, and its employees, in growing the company and in making Swarthmore a firm of the utmost prominence, so that he would not take on other commitments and positions.

33.    Nevels further stated to Plaintiffs that for him to accomplish these goals, he needed Plaintiffs to join the team and assist him in the management of the company, including but not limited to, input in making decisions regarding personnel, client recruitment, selection of assets, and all other management decisions.

34.    During their discussions, Plaintiffs, provided the Defendants with their ideas for the successful management of Swarthmore, including but not limited to, upgrading staff,

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

implementing a disciplined and repeatable fundamental research process, deploying performance attribution systems, enhancing marketing materials, and diversifying over-concentrated portfolios.

35.     In response, Nevels committed to Plaintiffs to provide the financial resources to obtain new talent at the firm, update the technology and resources, and implement much of their ideas to achieve success. This commitment by Nevels was repeated on a frequent basis after execution of the Employment Agreement to encourage the Plaintiffs to continue working for him and Swarthmore, especially when Plaintiffs told or insinuated that they were unhappy with the then conditions at Swarthmore.

36.     At that time, Plaintiffs were excited about the opportunity to work alongside Nevels to manage, operate and grow Swarthmore.

37.     Based on Nevels' representations to Plaintiffs, Plaintiffs reasonably believed that Nevels presented them with a unique employment opportunity that would provide for them to: work for a well-established and prominent company; assist in growing the company to new heights; learn from Nevels, who was not only dedicated to the life and growth of company he founded but, who had a new wind of excitement and focus, as well was eager to provide Plaintiffs with the opportunity to bring new personality to the company and implement their ideas and managerial decisions; and eventually take over control and management of Swarthmore when Nevels decided to step down.

38.     In or about January 2021, Nevels, on behalf of Swarthmore, offered Plaintiffs' an employment package to work for Swarthmore.

39.     Nevels described the positions that the Plaintiffs were offered at Swarthmore as "Senior Fixed Income Portfolio Managers."

40.     Nevels reiterated to the Plaintiffs that his intent of hiring them was for them to work, manage and grow the company, and take control of the company when he ultimately made the decision to reduce his involvement in the company and other businesses during the twilight of his life. Nevels was 68 years old at the time Plaintiffs were hired to work at Swarthmore, and he had no children.  Nevels told the Plaintiffs that he was "not getting any younger" and did not have anyone to pass the business on to, and he believed the Plaintiffs were a perfect fit to be the successor to him.

41.     Nevels considered the Plaintiffs as executives, respected their accomplishments, and sought their skills and leadership for Swarthmore.

42.     After Nevels offered employment at Swarthmore to the Plaintiffs, Plaintiffs and their counsel and Defendants and their counsel, engaged in negotiations over the terms of Plaintiffs employment agreements and the compensation package contained therein.

43.     During these negotiations, various changes were made to the original employment term sheet presented by the Defendant to the Plaintiffs, and multiple drafts of the employment agreement were circulated and revised by and between the Plaintiffs and Defendants.  Terms and conditions were actively negotiated, including the base salary, amount of bonus, percentage of equity, vacation days, and location of employment.

44.     For example, Nevels proposed Plaintiffs a three-year term for employment pursuant to which the Plaintiffs could neither leave the company, nor be terminated, unless the termination was for cause or good reason. Plaintiffs rejected the three-year term and after negotiations, the parties agreed to a guaranteed two-year term of employment.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

45.     In the execution of the Plaintiffs' employment agreements on behalf of Swarthmore, as its Chairman and CEO, Nevels knew, approved of, and agreed to, the final terms the parties ultimately agreed to.

46.     On or about January 15, 2021, Plaintiffs and Defendants entered into contracts of employment, each with the same terms (collectively the "Employment Agreement"). A true and accurate copies of the Employment Agreement each Plaintiff executed is annexed hereto as **Exhibits "A" and "B."**

47.     Under the Employment Agreement, Plaintiffs' employment started on January 15, 2021, and was to continue for a period of two consecutive years ("Employment Term").

48.     Pursuant to the Employment Agreement, Plaintiffs could <u>only</u> be terminated for "cause" as that term is specifically and exclusively defined in the Employment Agreement. *Id.* 5§(a).

49.     Moreover, Plaintiffs could only terminate their employment with Swarthmore before the end of the Employment Term for "Good Reason," as that term is defined in the Employment Agreement. *Id.* §5(a)(ii).

50.     Pursuant to the terms of the Employment Agreement, the Defendants guaranteed each of the Plaintiffs an annual salary of $250,000 (the "Salary") during the Employment Term, which was to increase from time to time based on their performance and effort. *See Id.* §4(a).

51.     Plaintiffs' compensation also included a guaranteed bonus for each Plaintiff for each year of the Employment Term, in the amount not to be less than $109,000/each, due between January 1 and March 31 of each calendar year following the year in which the bonus was earned ("Bonus"). *See Id.* §4(b).

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

52.     Upon information and belief, Nevels agreed to such terms because he believed that the Plaintiffs would provide stability, leadership, guidance, and legitimacy to Swarthmore based on the Plaintiffs prior experience, reputation, and success.

53.     During the negotiations, Nevels represented to Plaintiffs that Swarthmore was worth in excess of $3,500,000.00 based solely on the valuation that was placed on the equity that he agreed to have Swarthmore issue to the Plaintiffs.

54.     Pursuant to the terms of the Employment Agreement, Nevels guaranteed Plaintiffs that they would each be granted approximately 3.5% of the equity in the company in each of the first two years of their employment (on September 1 of each year) at the company, and each 3.5% was valued at $126,000, totaling 14% of the company valued at $504,000 (the "Equity"). *See* Exhibits "A" and "B" at §4(c).

55.     As further incentive, Nevels agreed that Swarthmore would pay the taxes on the Equity by furnishing Plaintiffs with an additional cash payment which, after deductions for taxes, equals the aggregate taxes, excluding federal income taxes, but including Social Security and Medicare taxes, withheld in connection with the Equity (the "Tax Payment").  The Tax Payment is to be paid no later than March 15th of the calendar year following the year in which the shares are required to be issued. *See Id.* §4(c).

56.     Pursuant to the terms of the Employment Agreement, Nevels promised to pay for each the Plaintiffs' health insurance (including for their families), which Nevels bragged was the best health insurance available on the market as he wanted his employees to have the same insurance that he had, which he said he insisted on being the best (the "Insurance"). *See Id.* §4(d).

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

57.     The Employment Agreement additionally permitted the Plaintiffs to participate in benefit and retirement plans or programs existing or established thereafter for the benefit of similarly situated employees at Swarthmore.

58.     The medical plan was a High Deductible Health Plan, with a Health Savings Account. Defendants represented that a maximum Health Savings Account contribution would be made by Swarthmore on behalf of each Plaintiff for each year of the Employment Term. The amount of the contribution for 2022 was approximately $7,400, to be paid in equal quarterly payments.

59.     Additionally, the Plaintiffs were to be reimbursed for all reasonable expenses incurred during the Employment Term and were provided 25 days of paid time-off (vacation time) per annum. *See* Exhibits "A" at "B" at §4(e)-(f).

60.     Nevels agreed to provide such compensation packages to the Plaintiffs, that included ownership interest in Swarthmore because at that time, upon information and belief, Nevels knew that he needed assistance in making material and fundamental managerial decisions, to bring the clients' accounts into compliance, fix the data integrity issues, implement compliance oversight, and improve the investment performance of the clients' accounts.

61.     The Employment Agreement also outlined the grounds for additional compensation as a result of termination. *See* Exhibits "A" and "B" at §4(d).

62.     From before, and at all times after the Plaintiffs executed the Employment Agreement, Nevels stated to the Plaintiffs and others that Plaintiffs were the "succession plan" for Swarthmore, as Nevels has no children and has not trained anyone to continue the operations of the business after he retired or otherwise decided to cease his control over the company.

63.    After execution of the Employment Agreement Nevels repeatedly stated that Plaintiffs' experience and expertise made them his perfect successors, and he desired for the company to prosper and continue its existence well beyond his demise. In fact, Nevels told others in the presence of the Plaintiffs, that Swarthmore was "built to last", based on the premise that the Plaintiffs were the future leaders of the company after his succession.

64.    To induce the Plaintiffs to continue to perform under the terms of the Employment Agreement, and not to terminate their Employment Agreement and seek other employment with better financial and professional opportunities, Nevels promised the Plaintiffs, among other things: that he would provide resources, including additional staff and technology, as well as he would expand the investment strategies for Swarthmore to assist the Plaintiffs in growing and improving the business and that Plaintiffs could participate and influence the hiring process of additional employees to continue to grow and prosper Swarthmore.

65.    Defendants and their counsel, and Plaintiff's and their counsel, actively negotiated and drafted the Employment Agreement, and Nevels executed the same on behalf of Swarthmore as defined by the Employment Agreement, and he even noted that he was the Chairman and Chief Executive Officer of Swarthmore under his signature.

66.    Plaintiffs accepted the offer of employment with Swarthmore in accordance with the terms of the Employment Agreement but did so also on the explicit and material representations from Nevels that they would have managerial input in the company and that Nevels would provide funds so the Plaintiffs could upgrade the company's technology, hire experienced and capable professionals, and a marketing budget to enable the Plaintiffs to solicit new business from prospective clients.

67.     Thus, Nevels sought talent to manage and operate Swarthmore better than he had, as Swarthmore's performance had not achieved successful returns and the company was in complete disarray.

68.     As such, it was important to the parties that Plaintiffs and Nevels worked together to manage and grow the business.

69.     Shortly after hiring of Plaintiffs, on February 22, 2021, Nevels issued a press release by Swarthmore announcing to the world that the Plaintiffs were then executives of Swarthmore. The press release, located at https://www.businesswire.com/news/home/20210222005126/en/The-Swarthmore-Group-Adds-Steven-Schweitzer-and-Scott-Mero-as-Senior-Fixed-Income-Portfolio-Managers, was titled "The Swarthmore Group Adds Steven Schweitzer and Scott Mero as Senior Fixed Income Portfolio Managers" (the "Press Release").

70.     The Press Release specifically stated that the Plaintiffs were "partners" of Swarthmore, and that the Plaintiffs "strengthens Swarthmore's management team and positions the company for long-term growth…"

71.     The Press Release also quoted Nevels, who stated that Plaintiffs were hired for "the benefit of our [Swarthmore's] existing and prospective clients" and that their hiring was to "build upon the firm's 29 years of client dedication, and we look forward to passing the baton to the next generation of leaders."

72.     In fact, the Press Release also quoted the Plaintiffs who stated that they were going to "work with Jim Nevels" and "develop new product capabilities and grow the firm from a boutique to a world-class asset manager."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

73.     Finally, Nevels included in the Press Release that "The Swarthmore Group is one of the oldest, active, minority-owned registered investment advisors headquartered in the Commonwealth of Pennsylvania. It offers wealth management, institutional investing, and institutional consulting services to a diverse group of individuals and institutions. More information is available at swarthmoregroup.com."

74.     In their acceptance of the employment offer with Swarthmore, and continuing after the commencement of their employment and at times when Nevels believed the Plaintiffs would not continue their employment, Plaintiffs relied on Nevels representations that they were being hired as part of Swarthmore's succession planning. This included the representations that Plaintiffs would be provided upgraded information systems and analyst support, among other essentials necessary for Plaintiffs to succeed in their new position, and that Plaintiffs would be partners with Nevels, wherein they worked with him as opposed to for him.

75.     After execution of the Employment Agreement, Nevels specifically stated that he looked forward 'to the day when it's [Swarthmore was] not a minority-owned firm' and he was "partners" with the Plaintiffs.

76.     The Defendants breached the Employment Agreement, almost instantly, as Nevels was rarely available, and the Plaintiffs were directed to report to Denise Caruso, who was a certified public accountant and held the title of Chief Compliance Officer and Controller at Swarthmore.

77.     Nevels was required to, and in fact reported to the Securities and Exchange Commission on March 30, 2022, in a Form ADV (a form used by investment advisers to register with the SEC) that he met with Mr. Schweitzer on a weekly basis to review Swarthmore's client's portfolios. However, Nevels rarely never met or discussed the clients' portfolios, even though there

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

were almost daily meetings scheduled to discuss the firm's clients' portfolios and strategies, but Nevels declined to attend and participate in such meetings.

78.     When the parties had disputes, Nevels would reassure the Plaintiffs that they 'did not work for Nevels, but they worked together' and that they were partners who worked "collaboratively".

79.     In fact, Nevels always promoted to the Plaintiffs and others that he expected Swarthmore to continue well past his cessation of control, and the Plaintiffs would become the face of the company.   Furthermore, Nevels stated that he would surrender control when the Plaintiffs believe that his rolodex was no longer alive.  Specifically, Nevels stated to the Plaintiffs that "This is about my personal and professional legacy and what that means is I want this thing to go on in whatever form you guys take it."

80.     This partnership ideology and commitment was repeated by Nevels throughout the Plaintiffs' employment to encourage and induce the Plaintiffs to continue working at Swarthmore and not to seek alternative employment.

81.     Additionally, Nevels permitted the Defendants to work from their homes, with no expectation or requirement that they work in the office.  In fact, Nevels stated to the Plaintiffs that many employees were permitted to work from their homes, which included locations in Delaware, New Jersey, Pennsylvania, and New York.

82.     Nevels even stated that he traveled to New York on a frequent basis, so he could meet with the Plaintiffs in New York if need be. In fact, routinely, Nevels would call into the company's morning meetings on video and advised the Plaintiffs and others on the calls that he was in a car service traveling to New York City, New York for the day.

83.     Plaintiffs met with one of Swarthmore's analysts, Ben Pickles (who traveled to New York from Pennsylvania), on numerous occasions in New York to discuss matters involving Swarthmore and its clients.

84.     Swarthmore had clients located in New York, including the Archdiocese of New York.

85.     Additionally, of Swarthmore's trading counterparties were located in New York and the Plaintiffs communicated and met with, including but not limited to, Barclays, Goldman Sachs, JP Morgan, Citi Group, Deutsche Bank, Bank of America, Toronto Dominion, UBS, and HSBC.

86.     Shortly after Plaintiffs' employment with Swarthmore began, and Plaintiffs learned of the disarray of the back office and lack of proper controls. Plaintiffs quickly expressed these same concerns to Nevels regarding the staff Nevels had in place prior to, and at the commencement of, their Employment Term. Nevels agreed to address these issues but claimed to be unaware of the magnitude of such problems. However, Nevels took minimal to no action to rectify the disarray until months later when the company was unable to conduct trading in the clients' accounts.

87.     Immediately upon the commencement of their employment with Swarthmore, Plaintiffs initiated a disciplined, repeatable, fundamental research process, crafted performance attribution reports, created marketing materials, and diversified over-concentrated portfolios.

88.     The Plaintiffs requested that Nevels honor his pre-execution of the Employment Agreement commitments by providing new, additional, and improved technical and administrative resources and staff for the company.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

89.     The Plaintiffs sought to retain highly experienced and successful staff to implement their plan and efforts to grow and improve Swarthmore, which Nevels represented to Plaintiffs that he would provide substantial resources to do so.

90.     Upon information and belief, many of the representations and commitments Nevels made to the Plaintiffs were false and intended to only induce Plaintiffs to agree to work for Swarthmore at a reduced salary from what the Plaintiffs otherwise would have accepted as Nevels provided an equity and bonus structure in lieu of a higher salary.

91.     Soon after the Employment Term began it was evident to the Plaintiffs that Swarthmore was in absolute disarray, as many of the firm's clients' accounts were not in compliance with their investment guidelines and restrictions, the IT data systems had significant integrity issues, there was a lack of compliance oversight, numerous employees were unable to adequately perform their job duties, and Nevels was absent from the day-to-day operations of the company.

92.     Consequently, in order to honor their commitments to the company and to fix these fundamental problems, Plaintiffs continued to insist that Nevels honor his commitments to them.

93.     However, it quickly became evident to Plaintiffs that Nevels did not intend to honor his verbal commitments to the Plaintiffs, those which were made prior to execution of the Employment Agreement and repeated thereafter.

94.     As a result of such, the relationship between Plaintiffs and Nevels became strained, with Nevels attempting to deflect the results of his systematic and continuous mismanagement on the Plaintiffs even though he had a long history of mismanagement and clients firing him for poor performance, upon information and belief.

95.     In June 2021, Plaintiffs were unsatisfied with their employment at Swarthmore and the lack of remedial action on Nevels part with respect to the back office and controls of the company. Such dissatisfaction was a result of the expectations the Plaintiffs had based on Nevels' representations and promises to them at times before and after they executed the Employment Agreement.

96.     At that time, Plaintiffs desired to terminate their employment with Swarthmore based on such, and Nevels could see their frustration, who desired to retain the Plaintiffs in their roles at Swarthmore and make them feel confident in their positions with the company.

97.     In response to their concerns, Plaintiffs and Nevels had a conversation.

98.     During their conversations with Nevels at that time, to induce Plaintiffs to continue their employment at Swarthmore, Nevels promised the Plaintiffs, among other things, that he would provide them with additional staff and expand investment strategies for Swarthmore to assist them in growing and improving the business, and that Plaintiffs could participate in the hiring process of new Employees. Nevels also stated to Plaintiffs and others (both in and outside their presence) that Plaintiffs were the future of Swarthmore, would manage and operate the business as his successors in the near future, and that he would take aggressive corrective action to ensure the long-term success of Swarthmore so that the Plaintiffs could continue to operate and grow the company.

99.     Nevels concluded the conversation between him and Plaintiffs and stated, in essence, that he was Swarthmore, and he expected the Plaintiffs to perform under the Employment Agreement and he (Swarthmore) would comply with their obligations in stating, "I will live up to my end of the agreement and you guys live up to yours."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

100.    Based upon these post execution of the Employment Agreement promises and representations, Plaintiffs continued their employment at Swarthmore with the expectation that Nevels would honor his commitment and was truthful to them. Indeed, Plaintiffs made clear that but for Nevels' promises, including the promise that Nevels would name Plaintiffs as his successors of Swarthmore and that they had the authority to manage and develop new clients, Plaintiffs would not have continued their employment at Swarthmore.

101.    In fact, specifically in the Employment Agreement, the Plaintiffs had the right to terminate their employment with Swarthmore, which existed based on Nevels conduct throughout their employment term with the company.

102.    In June 2021, the Plaintiffs were wrongly and maliciously accused of causing the nervous breakdown and hospitalization of a back-office operations staff person ("Ricardo"). Nevels hired a replacement, without any consultation with Plaintiffs, even though the replacement was wholly unable to perform the vast number of tasks required of him.

103.    In fact, Nevels continues to hamper the repair of the company's back-office as the replacement employee hired by Nevels was unable to reconcile accounts and had difficulty settling trades, due to the lack of any operating procedures or manuals for back-office systems.

104.    The extreme disarray in the back-office and the clients' accounts not reconciled caused Nevels and Denise Caruso (the company's Chief Compliance Officer and Controller) ("Caruso") to restrict trading on the clients' accounts that Plaintiffs managed, until the accounts were properly reconciled.

105.    In fact, from May 4, 2021, to August 16, 2021, Plaintiffs did not receive any daily performance reports and from May 4, 2021, to September 24, 2021, Plaintiffs never received any morning reports.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

106.    From June 7, 2021, until approximately June 25, 2021, the company prohibited Plaintiffs from discretionary trading to the detriment of Swarthmore's clients, and the Plaintiffs were without knowledge of the clients' accounts' cash balances and position sizes.

107.    The Plaintiffs (and the rest of the staff at Swarthmore) had no ability to obtain morning reports, attribution reports, and daily performance reports for months, which were necessary for Plaintiffs to trade Swarthmore's clients' accounts, because such accounts were not reconciled and there was no knowledge of correct position sizes and accurate cash balances in the clients' accounts.

108.    In fact, at that time, Nevels and/or Caruso sought assistance and information from prior employees to try to access account information and use the company's operating systems. Neither Nevels or those he employed had any knowledge as to how to access the records, reconcile the clients' accounts, or knew the balances in each of the clients' accounts.

109.    Without the reports, Plaintiffs were unable to trade the clients' portfolios for a period of time, to the detriment of the clients.

110.    Nevels readily acknowledged that the matter reached "crises proportions" and could result in the destruction of Swarthmore.

111.    Plaintiffs were repeatedly told by Nevels that he was taking aggressive corrective action and that a resolution was imminent, but such did not happen.

112.    In fact, at the time the Plaintiffs were hired, Nevels knew that Swarthmore's performance of the clients' accounts was a result of his mismanagement and refusal to take decisive action. The later blame of Plaintiffs for this was wrong and merely Nevels deflecting as the performance was a result of Nevels' mismanagement, gross negligence, and malfeasance in

operating the company in his own best interest, to which he never acknowledged or accepted any responsibility for.

113.    Given the post execution of the Employment Agreement commitments and promises by Nevels to Plaintiffs, and the clear need for a research analyst, Plaintiffs undertook the search at the direction of Nevels and Caruso, which included the requirement, among other things, that the candidate was capable of preparing reports for the clients' accounts.

114.    On June 7, 2021, Nevels conducted a conference call with Plaintiffs and Caruso, during which he improperly berated and blamed the Plaintiffs for Swarthmore's problems and poor performance in the clients' accounts (the "Call").

115.    During the Call, Nevels berated Plaintiffs for interviewing "over-experienced" research analyst candidates, and immediately terminated the search, even though such level of experience was required to appropriately handle the tasks at Swarthmore. In fact, Nevels and Caruso were actively involved in the entire hiring process, and in fact approved the candidates for interviews and participated in such.

116.    Nevels made comments during the Call that he believed Plaintiffs undermined his managerial authority through their creation of a "high school boy's clique" alongside others.

117.    Furthermore, during the Call, Nevels directed the Plaintiffs to do their job, and said that he was a man of his word and that he would honor the terms of the Employment Agreement and the post execution of the Employment Agreement promises he made.

118.    In fact, Nevels claimed to the Plaintiffs that he was in the final stages of securing clients for a new fund, which would provide significant new revenues for Swarthmore, which the Plaintiffs would benefit in such increased revenues. Nevels made this misrepresentation solely to induce the Plaintiffs to continue their employment with Swarthmore.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

119.    At that time, Nevels was aware of the Plaintiffs' concerns and belief that Nevels had not honored the representations he made in the recruitment of them to work for Swarthmore as well as the post execution of the Employment Agreement promises he made.

120.    At that time, upon information and belief, Nevels was concerned that the Plaintiffs would exercise their rights under the Employment Agreement and terminate their employment with Swarthmore as a result of (i) their discovery that Swarthmore was in disarray – which was contrary to the representations that Nevels had presented to the Plaintiffs to lead them to believe that Swarthmore did not have any fundamental internal problems; and (ii) Nevels failure to abide by his post execution of the Employment Agreement promises to plaintiff – which induced Plaintiffs to continue their employment with Swarthmore. Thus, at that time, Nevels reaffirmed Swarthmore's post execution of the Employment Agreement obligations to the Plaintiffs and stated that he (and Swarthmore) would honor such promises.

121.    On or about October 21, 2021, as the issue progressively worsened, Nevels sent an admonishing email warning the Plaintiffs that their performance has not met expectations despite their desperate efforts to fix operations, which Nevels hindered. Clearly, Nevels merely was attempting to deflect his mismanagement and refusal to take decisive action to the Plaintiffs and use them as scapegoats.

122.    Nevels retained incompetent employees who made numerous mistakes or were wholly ineffective, which resulted in delays and harm to Swarthmore's clients (and in essence the value of the company).

123.    Nevels generally refused to accept and follow through with Plaintiffs' advice and suggestions.

124.    For example, Ricardo communicated wrong information to clients, and it was his inability and the stresses from his employment duties at Swarthmore that likely caused Ricardo to seek psychiatric help. In response to Plaintiffs' request to replace Ricardo, Nevels responded that it was the Plaintiffs' tough regiment that caused Ricardo's psychiatric issues.

125.    Indeed, when Schweitzer stated to Nevels that Ricardo had been overworked for a while and he sought to assist him by inquiring into what work he could be relieved of, Nevels berated Plaintiffs calling them aiders and abettors and accused them of "putting another shrimp on his barbie, didn't you!" Nevels berated Plaintiffs about giving Ricardo work falling under his job description while at the same time refusing to hire either additional staff or more qualified staff who was able to handle the workload at Swarthmore.

126.    Instead, Nevels hired individuals such as the son of the company's chief compliance officer and controller (who worked at the company for almost 20 years), even though he added no value to the company and did not have the requisite skills and/or experience.

127.    Nevels requested from the Plaintiffs their thoughts and guidance on hiring interns in 2021, stating that he "knows how good [Plaintiffs] are at developing young talent" and that he would "leave it to [Plaintiffs'] wise discretion."

128.    In response to this inquiry, Plaintiffs informally received several resumes for internship positions at Swarthmore.

129.    In March 2022, Plaintiffs referred numerous economically disadvantaged college students who were very qualified for internships with the company to Nevels. These candidates desired to work for no financial compensation during the summer of 2022 and were superior candidates that would have benefitted the company without the need of Swarthmore to expend resources.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

130.    Astoundingly, Nevels scolded Plaintiffs for undertaking an unapproved search and claimed the company had adequate staff resources, even though it did not and Nevels knew such.

131.    Nevels' poor management and oversight of Swarthmore, including nepotism, resulted in Swarthmore's inability to successfully manage it clients' accounts, as Nevels was absent from the day-to-day investment decisions of the clients' accounts even though he was on the Investment Committee.

132.    During their employment at Swarthmore, the Plaintiffs were told by Nevels that the Plaintiffs could create a "crossover" fund and raise capital for such.

133.    The Plaintiffs developed a crossover fund "White Paper", which would provide clients with opportunities to invest in an investment vehicle with higher potential returns than the investments that Swarthmore had available to its clients.

134.    Nevels advised the Plaintiffs that they would participate with him in the solicitation of the crossover fund to clients.

135.    Nevels requested the creation of the crossover fund, White Paper, and committed to the Plaintiffs that Swarthmore would pitch this new investment option to existing and prospective clients. Plaintiffs provided the White Paper to Nevels, but upon information and belief he ignored and never actively solicited clients with this potentially profitable option for the company.

136.    However, even though Plaintiffs created the White Paper, Nevels did not promote the crossover fund to any clients, nor did he disclose to the Plaintiffs that he had done so.

137.    On or about March 2022, also in furtherance of Nevels' representation to the Plaintiffs that Swarthmore required other investment options for its clients, Nevels discussed with Plaintiffs and others a new investment opportunity for Swarthmore's clients.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

138.    Nevels stated to the Plaintiffs that based on his relationship with Livingston Street Capital ("Livingston"), Swarthmore was able to offer its clients an investment in Livingston's Low Income Housing Tax Credit fund (the "LIHTC").

139.    Nevels told the Plaintiffs that if Swarthmore could persuade any of its clients to invest in the LIHTC, such investments would provide large profit opportunities for the company at no cost as Livingston would be operating and managing the LIHTC.

140.    Nevels told the Plaintiffs that all Swarthmore needed to do was solicit its clients and convince them to invest in this new opportunity.

141.    Additionally, Nevels stated to the Plaintiffs that the investments in the LIHTC would place him and the clients in a good public light as the LIHTC funds supports low-income families with affordable housing, as well as a stream of income for Swarthmore.

142.    Upon information and belief, Nevels is still in communication and/or business with Livingston to raise funds for the LIHTC.

143.    As a result of Nevels' treatment of Plaintiffs, the disarray of Swarthmore under Nevels' control, and Nevels failure to adhere to his pre and post execution of the Employment Agreement promises, Plaintiffs desired to terminate their employment with Swarthmore but only as a result of Nevels' continued misrepresentations of the direction of Swarthmore and his commitment to support change and the transfer of the management of the company to the Plaintiffs did they not.

144.    Nevels conducted meetings with clients and introduced the Plaintiffs as the heirs to the management and leadership of Swarthmore to such clients.

145.    On or about June 6, 2022, Nevels participated in a meeting with Goldman Sachs, a multinational investment bank and financial services company, to discuss issues involving one of Swarthmore's clients that retained Goldman Sachs as a consultant.

146.    Upon conducting due diligence on this client's account, Goldman Sachs requested to meet with Swarthmore as they were impressed with Swarthmore's performance of the client's account. Plaintiffs conducted multiple meetings with Goldman Sachs during which time Plaintiffs presented to Goldman Sachs their strategies for future investment strategies for the client.

147.    Impressed with Plaintiffs' strategies and comprehensive presentation (based on a thorough research process conducted by the Plaintiffs), Goldman Sachs expressed to Plaintiffs that it might have other clients who would be interested in investing with Swarthmore.

148.    As such, a meeting was scheduled and conducted between Nevels and Goldman Sachs to learn more about Swarthmore and specifically about Nevels' succession plan and minority ownership, as Nevels would be considered to be a "Key Man."

149.    On June 6, 2022, a week before announcing the closure of Swarthmore, Nevels met with Goldman Sachs at which time Nevels bragged to Goldman Sachs that Swarthmore was "Built to Last". Nevels' intention was to lead Goldman Sachs and others to believe that Swarthmore was a strong and vibrant company. During this meeting Nevels presented to Goldman Sachs his succession plan, which did not include the termination of Swarthmore and a cessation of all business, but rather presented a strong leadership for the future of the company led by Plaintiffs.

150.    Upon information and belief, Nevels made this representation to Goldman Sachs to bolster his own image when in fact Nevels had absolutely no clue as to the client's portfolio and no involvement in the decision-making process for investments in such accounts.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

151.    On or about June 14, 2022, Nevels conducted a short meeting with the company's employees, during which time he advised the employees that Swarthmore intended to cease conducting business on June 30, 2022, and that the clients' investments would be returned to them. This meeting came as a total surprise to the Plaintiffs.

152.    Nevels stated at the meeting that Swarthmore's dismantling and cessation of business was solely because of the deterioration of his and his wife's health, and that the two of them were to move into an assisted living facility.

153.    In fact, based upon communications from several of Swarthmore's clients, Nevels told clients (as he told Swarthmore's employees) that the reason for the closure of Swarthmore's business was because of his wife's medical condition.

154.    In May 2022, Nevels also told the Plaintiffs that he endured a medical conditions that he said would not prevent him from operating Swarthmore's business, even though Nevels traveled internationally in the several weeks prior, traveled on a routine basis outside the Philadelphia, Pennsylvania metropolitan area, and continued to hold seats on several publicly traded boards of directors as a professor at a university.

155.    Nevels stated, at an impromptu meeting with the company's employees, that Swarthmore was to close on June 30, 2022.

156.    Upon information and belief, Nevels did not discuss Swarthmore's closing with any of the shareholders, and certainly did not discuss this decision with the Plaintiffs, who were also shareholders of the company.

157.    Nevels did not provide any written notices to the employees of Swarthmore at that time, nor did he disclose his intent with respect to salaries, health insurance and other benefits,

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

rather he specifically stated to the employees (including Plaintiffs) that they would be paid through the end of June 2022.

158.    Upon information and belief, Nevels and his wife have not placed any of their residences on the real estate market, including their primary residence, in anticipation of moving into an assisted living facility.

159.    Plaintiffs agreed to continue their employment with Swarthmore pursuant to the terms and conditions set forth in the Employment Agreement and the representations made by Nevels during the hiring of the Plaintiffs, as well as those Nevels made post execution of the Employment Agreement. . In fact, Plaintiffs continued to execute on all client liquidation requests and worked as the status quo.

160.    However, Nevels did not honor those promises and representations and refused to let Plaintiffs continue their employment.

161.    On or about June 15, 2022, Plaintiffs demanded of the Defendants that funds be placed into an escrow account to satisfy Defendants' obligations to Plaintiffs pursuant to the Employment Agreement.

162.    Plaintiffs sent Swarthmore, and in turn Nevels, a demand letter demanding to compensation in accordance with the terms of the Employment Agreement (the "Demand Letter"). *See* **Exhibit "C."**

163.    In the Demand Letter, the Defendants were reminded that Nevels conducted an "impromptu meeting" and stated the company was closing because of the "deterioration of his [Nevels] and his wife's health."

164.    At that time, and all other times, Plaintiffs continued to conduct themselves in a professional manner, serviced Swarthmore's clients, and honored their fiduciary and contract obligations.

165.    In response to the Demand Letter, Swarthmore's counsel responded to the email (albeit almost 20 hours later) and merely stated "I received your letter."

166.    After a follow up email, a week later, Swarthmore's counsel stated "We no longer represent the Swarthmore Group.   I do not have any information as to who may be representing the company at this point."

167.    On or about June 17, 2022, Schweitzer received an inquiry from a reputable private equity firm that owns other asset management businesses as to why certain clients had liquidated their accounts with Swarthmore.

168.    Schweitzer responded to the inquiry and stated that per Nevels directive, Swarthmore would cease to exist after June 30, 2022, because of his and his wife's health.

169.    Soon thereafter, the private equity firm stated that his company would be interested in purchasing part or all of Swarthmore's business, as well as he heard the same reasoning for the closure of Swarthmore.

170.    Schweitzer advised Nevels that there was a prospective buyer for Swarthmore, but Nevels did not respond to the communication.

171.    Upon information and belief, the private equity firm emailed and called Nevels and expressed its interest in purchasing all or part of Swarthmore, but Nevels did not respond to either communication.

172.    Nevels never entertained the idea of permitting Swarthmore to be sold to permit Plaintiffs and the rest of Swarthmore's employees to continue their employment and receive the

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

benefit from their equity interest in the company. In fact, in the past, Nevels had been approached by other persons about a possible merger or takeover, and Nevels always deflected such overtures.

173. Upon information and belief, Nevels did not entertain such inquiries to purchase part or all of Swarthmore as he sought to hide his wholly gross negligence and terrible management of Swarthmore.

174. Neither of the Defendants provided a schedule or any information to the Plaintiffs about their compensation under the Employment Agreement and amounts that are due to them.

175. On June 27, 2022, without any prior written communication and only the one brief meeting for no more than five minutes, Nevels sent all the Swarthmore employees a memorandum in which he stated that the closure of Swarthmore was "due to declines in the business related to dramatic changes in the investment industry and economic conditions" (the "Closure Memo.") *See* **Exhibit "D."**

176. In the Closure Memo, Nevels stated that all of the employees' benefits and compensation would cease on June 30, 2022, leaving all of the employees with only three days to secure health insurance and new employment before their benefits terminated.

177. Furthermore, Nevels hid behind his attorney and refused to respond to inquiries as he directed "any questions to The Swarthmore Group's counsel, Douglas G. Leney, Esq., of Acher & Greiner P.C. (dleney@archerlaw.com)."

178. At no time prior to the letter did Defendants reveal that there were any financial issues with Swarthmore, nor did Defendants have any plans to rectify the financial issues.

179. Upon information and belief, even though Nevels has an impressive resume, he knows that there is little substance behind such resume, and he sought to mislead and disguise the

truthful reasons for the closure of Swarthmore, which was Nevels gross negligence and egotistical management of the company.

180.   Nevels operated Swarthmore as his alter ego and claimed Swarthmore to be him as he acted through Swarthmore and Swarthmore acted as him.

181.   Even though Swarthmore had investors and shareholders, Nevels acted and made decisions for the company in his individual capacity and did so for his own personal benefit.

182.   Nevels employed and continued to employ persons who were incompetent and unable to perform the remedial tasks required of them because Nevels had personal relationships with such employees.

183.   Nevels' gross negligence in the operations and oversight of the company led to its failure, as he refused to implement the proper procedures and make the necessary changes to operate the company in a successful manner.

184.   To induce Plaintiffs to continue their employment at Swarthmore Nevels continually misrepresented to the Plaintiffs that he would permit change and improvement to be implemented at Swarthmore with respect to the operations and management of the company. Contrary to the commitment to involve the Plaintiffs in the decision-making process and to adhere to their recommendations during the interview and negotiation periods, Nevels wholly disregarded such advice and recommendations after the Plaintiffs joined Swarthmore as employees and shareholders.

185.   Nevels' failure to honor his word to the Plaintiffs is not a unique trait of his. Upon information and belief, in 2005, Nevels committed a $1,000,000 gift to the University of Pennsylvania for a scholarship fund in honor of the law school's dean, Michael A. Fitts. Nevels allegedly stated, at that time that, "As the first person in my family to attend college, I feel I owe

a great debt to Penn Law School, which paved the way for my subsequent success," and "The least I can do is help others gain the same advantage that a Penn education afforded me." However, upon information and belief, Nevels failed to honor his commitment to the university and used Swarthmore's marketing manager to state that 'He [Nevels] does not discuss his philanthropic activities.'

186.    Upon information and belief, during the Employment Term, Nevels committed to pay a bonus to another employee to induce her to continue her employment at Swarthmore, and he failed to honor that commitment.

187.    Upon information and belief, Nevels committed to issue equity in Swarthmore to a former employee as an incentive for his employment at the company, which Nevels never issued.

188.    Upon information and belief, a former employee of Swarthmore, who Nevels admired, was provided a company-owned computer and the company paid for her health insurance after her resignation from the company when she went to work with Nevels at the School District of Philadelphia, School Reform Commission.

189.    Upon information and belief, Nevels not only deceived his employees and shareholders, but also his wife. Upon information and belief, during the time that Nevels managed and operated Swarthmore, he proclaimed that the company's employees must be of the utmost character and honesty. However, Nevels did not follow through with this ideology, as he had various affairs; including with a prominent Philadelphia woman who he paid for her mortgage, and another who is a director on multiple boards who Nevels allegedly planned a wedding with while already married to his current wife. Even though Nevels allegedly cheated on his wife, he ceased Swarthmore's business because he stated to the employees that she needed to reside in an assisted living facility.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

190.    Nevels' representations induced the Plaintiffs to agree to enter into the Employment Agreement, as well as to continue working at Swarthmore in June 2021 when he promised to honor the post execution of the Employment Agreement promises he made to Plaintiffs.

191.    Nevels unilaterally terminated all of Swarthmore's business without consideration of other options and consultation of shareholders.

192.    Nevels' actions, without concern of the effects on families including the Plaintiffs, left families without an income and insurance, including those with pregnant wives and sick children who are in need of expensive medical care, albeit COBRA later was offered for an uncertain period.

193.    The Plaintiffs have been damaged by Nevels deceit and mental Napoleonic complex, which resulted in frivolous actions taken with respect to Swarthmore and the Plaintiffs.

194.    To date, Defendants have intentionally, willfully, and in bad faith, refused to tender Plaintiff all wages due and owing to them under the Employment Agreement and the severance owed to them thereunder, including but not limited to salary previously earned.

### AS AND FOR THE FIRST CAUSE OF ACTION
**BREACH OF CONTRACT**
**As Against Defendants**

195.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 194 of this Amended Complaint as though set forth fully herein.

196.    On or about January 15, 2021, the Plaintiffs and Swarthmore entered into a valid and enforceable written contract for Plaintiffs' employment with Swarthmore, i.e., the Employment Agreement.

197.    Plaintiffs performed all their obligations under the Employment Agreement.

198.    As detailed herein, Nevels operated Swarthmore as his alter ego.

199.    Pursuant to the terms of the heavily negotiated Employment Agreement, the Plaintiff's employment started and the Employment Term commenced on January 15, 2021, and was to continue for a period of two consecutive years.

200.    As set forth above, the Employment Agreement unequivocally and unambiguously provides that for *each year* of the Employment Term Swarthmore is to provide *each Plaintiff* with the following:  (i) a salary of $250,000 per year; (ii) a bonus of no less than $109,000 per year to be paid between January 1 and March 31 of the calendar year following the year in which the bonus was earned; (iii) 3.5% of the company per year as an equity bonus, in shares of common stock of Swarthmore, totaling 14% of the company (each issuance being 3.5% of ownership in the company in stock valued at $126,000); (iv) a yearly cash payment (the Tax Payment) that, after deductions, equals the aggregate taxes withheld from the particular Plaintiff in connection with the Equity, excluding federal income taxes, but including Social Security and Medicare taxes; (v) participation in insurance, benefit and retirement plans or programs existing or established thereafter for the benefit of similarly situated employees at Swarthmore; (vi) reimbursement for all reasonable expenses incurred during the course of their work; and (vii) paid time off in the amount of twenty-five days as well as paid holidays in accordance with the Company's policies and applicable state and local law.

201.    Swarthmore announced the termination of Plaintiffs' employment at Swarthmore on June 14, 2022.

202.    Swarthmore provided each Plaintiff with a termination date of June 30, 2022.

203.    Per the terms of the Employment Agreement, the termination of Plaintiffs by Swarthmore was without cause.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

204.    Section 5(a)(i) of the Employment Agreement defines termination for cause as:

"<u>By Company for Cause</u>. For Purposes hereof, "<u>Cause</u>" means the occurrence of one of the following:

    (1) Fraud, embezzlement, dishonesty, or the taking of any action which constitutes self-dealing, or the acceptance or taking of any improper personal benefit in the performance of [Plaintiffs'] duties hereunder;

    (2) Conviction by a court of competent jurisdiction of, or entering a Plea of guilty or no contest to, any crime, whether or not relating to [Plaintiffs'] employment, which constitutes a felony or involves moral turpitude (excluding traffic-related offenses), or which has, as an element, fraud, dishonest or the conversion or property; or

    (3) Misappropriation of money or property of the Company or its affiliates by [Plaintiffs], or the acceptance of any unlawful bribe or kickback with respect to the Company's business; or

    (4) Breach of any of [Plaintiffs'] fiduciary duties of loyalty as an officer or director of the Company; or

    (5) Habitual or willful material neglect of duties or failure to comply with the reasonable and lawful directives of the Company's Board of Directors or the Principal; or

    (6) Knowing breach of any material provision of this Agreement. Notwithstanding the foregoing, ***the Company may not terminate [Plaintiffs'] employment for Cause without first providing [Plaintiff] with written notice of the grounds for termination for Cause and an opportunity to (within twenty one (21) days from the delivery of such notice) present information to the Company to explain, refute or mitigate the alleged grounds for termination for Cause, at which time the Company may, in its sole discretion, either implement its decision to terminate for Cause or rescind its earlier notice."***

*See* Exhibits "A" and "B" (emphasis added).

205.    The definitions as what constitutes termination by the company for "Cause" contained in §5(a)(i) of the Employment Agreement is exclusive. If termination is not for one of the occurrences specifically provided for in the exclusive list then termination is not considered a termination for "Cause" under the Employment Agreement.

206.    Additionally, even if Plaintiff engages in one of the occurrences defined as for "Cause," Plaintiffs termination still constitutes a termination "without cause" *unless* (i) each Plaintiff is notified by Swarthmore, in writing, of the grounds for cause; and (ii) each Plaintiff is

given the opportunity to explain, refute, or mitigate the alleged grounds for termination for Cause within twenty-one days of such notice; and (iii) Swarthmore then chooses to implement its decision to terminate the Plaintiff for cause after each Plaintiff is given the opportunity to defend the alleged grounds for termination for "Cause."

207.    Pursuant to §5(b) of the Employment Agreement "[a]ny purported termination by the Company for Cause … will be communicated by a written Notice of Termination. For purposes of this [Employment] Agreement, a "Notice of Termination" will mean a notice which indicated the specific termination provision in this Agreement relief upon and will, with respect to a termination for Cause […] set forth in reasonable detail the facts and circumstance claimed to provide a basis for such termination of the Executive's employment under the provision so indicated." *See* Exhibits "A" and "B" §5(b).

208.    Plaintiffs' termination by Swarthmore was stated to them to be the result of Nevels' health condition, which is not defined as an occurrence giving rise to a termination for "Cause" as that term is defined in the Employment Agreement, nor is the financial downturn in the economy which Nevels stated to the public as the basis for the company's closure.

209.    As such, Plaintiffs did not receive a "Notice of Termination" as that term is defined in §5(b) of the Employment Agreement.

210.    Consequently, Swarthmore did not (i) notice the Plaintiffs for the termination of their employment for any of the for "Cause" reasons; (ii) provide Plaintiff with an opportunity to present information to the company to explain, refute or mitigate the alleged grounds for termination for "Cause"; and (iii) Swarthmore did not make a decision to implement its decision to terminate for "Cause" after Plaintiffs contractual right to explain themselves.

211.    Therefore, under no event can it be said that the termination of Plaintiffs' employment with Swarthmore was for "Cause.".

212.    Moreover, the Employment Agreement provides that "A decision by the Company to not renew the Agreement under the same or similar terms…shall be considered a Termination without Cause for purposes of Section 5(c)."

213.    Pursuant to the terms of the Employment agreement, the Plaintiffs were terminated without cause.

214.    Plaintiffs are entitled to all the compensation provided for by the terms of the Employment Agreement for Termination by the Company without cause or by the Executive for Good Reason. This includes, but is not limited to, payment of the Salary, Bonus, Equity, benefits, Insurance, reimbursement of business expenses, and a severance package that includes four months of Salary and benefits.

215.    The Employment Agreement provides for additional payments due upon a termination by Defendants without Cause. Pursuant to § 5(c) the Employment Agreement, upon termination of the Employment Term by Defendants without Cause, the Plaintiffs are to be paid or provided:

> (i)     any unpaid Base Salary due and owing for periods prior to the termination, reimbursement for expenses reasonably and necessarily incurred during Plaintiffs' employment, and the proceeds of other life insurance, disability insurance or other benefits payable to Plaintiffs under the terms and conditions of any applicable policies and/or employee benefit plans, including with respect to any Shares pursuant to the terms of the Shareholder Agreement (collectively, the "Accrued Benefits") and
> (ii)    severance compensation for the period of four (4) months ("Severance Period") in the amount of the Base Salary in effect immediately prior to the date of notice of termination; and
> (iii)   continued coverage under any Company sponsored health and disability plan during the Severance Period, to the extent that Plaintiff otherwise qualifies for post-termination coverage, with each party incurring

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

the same out-of-pocket costs as in effect at the time of termination during the Severance Period. The amounts provided for in subsection (ii) and (iii) shall be paid to Plaintiff ratably over the Severance Period in accordance with the Company's normal payroll practices commencing on the first payroll date following the Plaintiff's date of termination. All other payments, if any, hereunder shall be payable on the dates on which they would have been paid had Plaintiff continued employment hereunder.

216.    Nevels agreed to all of the terms in the Employment Agreement, and entered into such agreement through Swarthmore, his alter ego.

217.    The Defendants are obligated to pay each of the Plaintiffs for the remaining period of time under the Employment Agreement, July 1, 2022, through January 19, 2023, totaling $135,416.66 for each of the Plaintiffs.

218.    The Defendants are obligated to pay each of the Plaintiffs for the severance period provided for under the Employment Agreement, totaling $83,333.33 for each of the Plaintiffs.

219.    Under the Employment Agreement, the Defendants are obligated to pay for health insurance for each of the Plaintiffs and their families for the duration of the Employment Term and the severance period, which is anticipated to cost approximately $2,00 to $3000 per month for each of the Plaintiffs, totaling approximately $20,000 for each of the Plaintiffs.

220.    The Plaintiffs incurred business expenses that they paid individually, and which the Defendants are obligated to reimburse pursuant to the terms and conditions of the Employment Agreement.  These amounts total approximately $1,000.

221.    Under the Employment Agreement, Defendants are obligated to pay each of the Plaintiffs the bonus for 2022, totaling $109,000 for each of the Plaintiffs.

222.    Under the Employment Agreement, the Defendants are obligated to pay each of the Plaintiffs the value of the Equity for 2022, totaling $126,000 for each of the Plaintiffs.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

223.    Under the Employment Agreement, the Defendants are obligated to pay each of the Plaintiffs the value of the Equity for 2021, totaling $126,000 for each of the Plaintiffs.

224.    Nevels is a policy-making officer and interested owner of Swarthmore. Nevels is the active decision maker for Swarthmore, actively exercises the policy-making function in the company, and is the officer responsible for dealing with, and making decisions with respect to, *inter alia*, the hiring and firing of employees, the terms of the employment contracts, the expenditures of corporate funds, who gets paid, how much each employee is to be paid, employees bonuses and benefits, etc.

225.    The damages incurred by Plaintiffs are a direct and proximate result of the Defendants' breach of the Employment Agreement.

**WHEREFORE**, Plaintiffs demand that the Court enter judgment in favor of each of the Plaintiffs and against the Defendants, jointly and severally on the first cause of action for breach of contract in an amount in excess of $1,244,499.98, plus interest from June 14, 2022, at the statutory rate, all statutory costs, and all further relief as this Court deems just and proper.


### AS AND FOR A SECOND CAUSE OF ACTION
**FRAUDULENT MISREPRESENTATION**
**As Against All Defendants**

226.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 194 of this Complaint as though set forth fully herein.

227.    Prior to the execution of the Employment Agreement, Nevels made many material representations to the Plaintiffs to induce them to accept employment at Swarthmore and enter the Employment Agreement. At the time, Nevels made the material representations set forth in this Complaint that Nevels knew were false at the time he made them.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

228.    The material misrepresentations were made with respect to, among other things, the authorities and responsibilities Plaintiffs were to have in carrying out their duties under the Employment Agreements.

229.    Nevels assured Plaintiffs that additional resources would be committed to Swarthmore to permit Plaintiffs to perform their duties and the Plaintiffs would have input over the management of the company.

230.    Nevels represented to the Plaintiffs that he would consolidate his focus on Swarthmore and not join any additional boards to avoid the continuation of poor investment management returns that occurred prior to the commencement of the Plaintiffs' employment.

231.    Nevels represented to the Plaintiffs that he desired for the Plaintiffs to be his partners and for them to take control of the management of Swarthmore and propel Swarthmore well beyond his departure from the company.

232.    Specifically, Nevels represented to the Plaintiffs that the Equity offered and tendered as part of their compensation was to provide the Plaintiffs with the opportunity to be his partners in Swarthmore, and because of the Equity, and the long-term value of such, Plaintiffs should accept a reduced salary than they would otherwise command on the open market with another employer.

233.    In fact, the Press Release specifically quoted Nevels in which he stated that the Plaintiffs were "partners" of Swarthmore, and that the Plaintiffs "strengthens Swarthmore's management team and positions the company for long-term growth…"

234.    The Press Release also quoted Nevels, who stated that Plaintiffs were hired for "the benefit of our [Swarthmore's] existing and prospective clients" and that their hiring was to "build

Page **40** of 56

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

upon the firm's 29 years of client dedication, and we look forward to passing the baton to the next generation of leaders."

235.    In fact, the Press Release also quoted the Plaintiffs who stated that they were going to "work with Jim Nevels" and "develop new product capabilities and grow the firm from a boutique to a world-class asset manager."

236.    Moreover, Nevels assured the Plaintiffs that they, and in turn Swarthmore, would be provided upgraded information systems, analyst support, and anything else they needed to succeed in their position and carry out their responsibilities and authorities.

237.    Nevels reneged on all of the material representations made during his pursuit of the Plaintiffs to induce them into accepting employment with Swarthmore.

238.    Nevels' misrepresentations were material to Plaintiffs' acceptance of employment with Swarthmore and agreement to the terms of the Employment Agreement.

239.    Based on Nevels' material (mis)representations, and intentional omissions, to Plaintiffs, Plaintiffs reasonably believed that Nevels presented them with a unique employment opportunity that would provide for them to: work for a well-established and prominent company; assist in growing the company to increased levels of profitability; learn from Nevels, who was not only dedicated to the life and growth of the Company he founded but, who had a new wind of excitement and focus, as well was eager to provide Plaintiffs with the opportunity to bring new personality to the company and implement their ideas and managerial decisions; and eventually take over exclusive control and management of Swarthmore when Nevels decided to retire (which was expected to be at most a few years from the commencement of their new jobs).

240.    Plaintiffs' reliance on Nevels material misrepresentations, and intentional omissions, was justifiable and reasonable.

241.    Plaintiffs justifiably relied on Nevels misrepresentations, and intentional omissions, and entered into the Employment Agreement for the opportunity to expand, grow and profit from Swarthmore, as well as to learn from Nevels who promised that he would be present and focused on Swarthmore.

242.    After Plaintiffs entered into the Employment Agreement, Nevels further diverted his focus from Swarthmore by becoming Chairman of the Board of Directors for the Business Council for International Understanding and by joining the Board of Directors for Renew Financial Group LLC. This was in addition to the positions he already held as an associate professor at Texas A&M University and as a member of the Board of Directors for Alcoa Corporation and WestRock. Additionally, it is believed that Nevels obtained his LLM degree at Texas A&M University during the Covid-19 pandemic and subsequently became an adjunct professor at Texas A&M University.

243.    Nevels terminated Plaintiffs' search for a research analyst for financial reasons as he was unwilling to compensate a candidate to the extent that he stated to the Plaintiffs prior to their acceptance of the terms of the Employment Agreement, rather Nevels hired a less experienced person to perform the tasks because he did not want to pay the compensation necessary to hire an adequate candidate.

244.    Nevels failed to provide the additional resources that he had repeatedly promised Plaintiffs prior to their agreement to the Employment Agreement.

245.    When the Plaintiffs presented Nevels with new investment strategies and opportunities for Swarthmore's clients, Nevels wholly disregarded Plaintiffs' suggestions without giving such the full consideration previously promised.

246.    Nevels was absent from the day-to-day management of Swarthmore, including but not limited to evaluation and decisions relating to clients' accounts in contravention of the material

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

promises he made to Plaintiffs that Plaintiffs were to be his partners in Swarthmore and that he would focus on the company.

247.    Upon information and belief, Nevels unilaterally decided to close Swarthmore for his own personal reasons.

248.    Nevels unilaterally ceased operations of Swarthmore despite the representations that he made to Plaintiffs, prior to Plaintiffs' acceptance of employment with Swarthmore, that they were the next generation who would take Swarthmore forward for the next 30 years and that their employment at Swarthmore would be their "final job."

249.    Nevels closed Swarthmore despite his material representations to Plaintiffs that when he decided to step down from Swarthmore, Plaintiffs would take over control and management of Swarthmore.

250.    Nevels' statements to the Plaintiffs were material misrepresentations intended to induce, and did ultimately induce, Plaintiffs to enter into Employment Agreement.

251.    At the time Nevels made these material misrepresentations to Plaintiffs, he knew that they were false.  Nevertheless, Nevels made these material misrepresentations despite having no intention to adhere to any of the representations he made to Plaintiffs prior to the Employment Agreement being signed and the Employment Term beginning.

252.    Nevels also deliberately did not disclose to the Plaintiffs material facts that would have resulted in Plaintiffs declining employment with Swarthmore which is tantamount to intentionally providing false information to Plaintiffs.

253.    Nevels stated that he was closing Swarthmore because he and his wife needed to enter into an assisted living facility.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

254.    Prior to the commencement of Plaintiff's employment at Swarthmore, Nevels failed to disclose the material fact that he and/or his wife were suffering from health problems although Nevels knew of such prior to the execution of the Employment Agreement.

255.    Prior to the commencement of Plaintiff's employment at Swarthmore, Nevels failed to disclose the material fact that he would close the business as a result of his and/or his wife's health problems although Nevels knew of such prior to the execution of the Employment Agreement.

256.    Prior to the commencement of Plaintiff's employment at Swarthmore, Nevels failed to disclose to Plaintiffs the material fact that if Nevels stepped away from Swarthmore he would close the business and the Plaintiffs would be unemployed.

257.    Prior to the commencement of Plaintiff's employment at Swarthmore, Nevels failed to disclose to Plaintiffs that material fact that Swarthmore was in, or was on the verge of being in, a financial condition that would result in Nevels closure of the company.

258.    Nevels never discussed, either prior to the Employment Agreement or anytime thereafter, the closure of Swarthmore with the Plaintiffs or the possibility of Swarthmore closing, rather he always stated that the company would move forward in his absence with the Plaintiffs as the leaders of the company

259.    Prior to Plaintiffs entering into the Employment Agreement, Nevels knew that he would never consider the Plaintiffs his partner, nor did he ever intend on providing the Plaintiffs with the opportunity to manage, control, grow and develop Swarthmore.

260.    At all relevant times, Nevels knew that he considered himself to be Swarthmore, that he considered himself the only manager/owner of Swarthmore, that he would not allow any other shareholder and/or employee to make any decisions on behalf of the company, and that when

he decided to cease the business, he would close Swarthmore and not provide the Plaintiffs with the opportunity to manage and operate the company.

261.    Prior to the commencement of Plaintiff's employment at Swarthmore, Nevels did not intend for the Plaintiffs to be owners of Swarthmore or to benefit from the Equity, as Nevels knew that he intended to close Swarthmore, and/or that when he did step away from Swarthmore he would cease the company's operations and seek alternative opportunities for himself.

262.    Prior to the commencement of Plaintiff's employment at Swarthmore, Nevels knew the value of the Equity was worthless, even though he claimed that each issuance of Equity to each of the Plaintiffs was valued at $126,000.

263.    Nevels' representations and his proposal of the terms in the Employment Agreement were false, and he knew they were false at the time he made the representations to the Plaintiffs.

264.    Plaintiffs suffered damages as a direct and proximate result of Nevels' material misrepresentations and material omissions.

**WHEREFORE**, Plaintiffs demand that the Court enter judgment in favor of each of the Plaintiffs and against the Defendants, jointly and severally on the second cause of action for misrepresentation in an amount in excess of $5,000,000, plus interest from January 15, 2021 at the statutory rate, all statutory costs, and all further relief as this Court deems just and proper.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
**FRADULENT INDUCEMENT**
**As Against All Defendants**

265.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 194 of this Complaint as though set forth fully herein.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

266.    After the commencement of the Employment Term, Plaintiffs learned of the disarray of the back office and basically the entire company, the lack of proper control and organization of the company's books and records, lack of control and guidance of the company's employees, and fundamental internal problems with Swarthmore's management and operations.

267.    Shortly after their employment started, it became apparent that Nevels had minimal control, poor guidance, and horrific management of Swarthmore, and he did not seem to desire to change.

268.    Even though Nevels promised the Plaintiffs prior to execution of the Employment Agreement that the Plaintiffs could manage and operate Swarthmore, and that they would soon take over total control of the company as he intended to cease such control, Nevels was extremely reluctant to follow through with those promises at the commencement of the Plaintiffs' employment with Swarthmore.

269.    Plaintiffs desired to terminate their employment with Swarthmore to seek other employment and Nevels was aware that Plaintiffs were not satisfied with the company's progress.

270.    Nevels stated to Plaintiffs that he would take immediate corrective action to fix the fundamental internal problems.

271.    Nevels stated to Plaintiffs that he would expend new, additional, and improved resources and staff to Swarthmore to permit Plaintiffs to succeed in their employment at Swarthmore.

272.    Nevels also stated to Plaintiffs that they would have managerial input in Swarthmore and that he would name Plaintiffs as his successors upon his cessation of control from Swarthmore.

273.    Nevels made the above statements, including others listed in this Amended Complaint, with knowledge of the falsity of such statements at the time such statements were made.

274.    Nevels made the above statements, including others listed in this Amended Complaint, with the intent to induce Plaintiff to rely on such and to not terminate their employment with Swarthmore.

275.    Plaintiffs justifiably relied on Nevels statements in deciding not to terminate their employment with Swarthmore and to continue working at Swarthmore.

276.    The above statements, including others listed in this Amended Complaint, were material to Plaintiffs' decision to continue their employment at Swarthmore rather than terminating their employment as Plaintiffs so desired.

277.    Plaintiffs were induced to continue their employment with Swarthmore by the material misrepresentations made by Nevels.

278.    As a direct and proximate result of Plaintiffs reliance on Nevels material misrepresentations Plaintiffs suffered resulting injuries.

**WHEREFORE**, Plaintiffs demand that the Court enter judgment in favor of each of the Plaintiffs and against Defendants on the third cause of action for fraudulent inducement in an amount to be determined at trial, but in no event less than $5,000,000, plus interest from June 14, 2022, at the statutory rate, all statutory costs, and all further relief as this Court deems just and proper.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

## AS AND FOR A FOURTH CAUSE OF ACTION
## VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW
### As Against All Defendants

279.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 194 of this Complaint as though set forth fully herein.

280.    Under the terms of the Employment Agreement, Plaintiffs were to be compensated a base salary of $250,000 per annum, which was to increase from time to time.

281.    Under the terms of the Employment Agreement Plaintiffs were to be further compensated (i) by a guaranteed bonus for each year of the Employment Term, in the amount not less than $109,000 per year; (ii) by the issuance of 3.5% of the Equity (valued at $126,000) of the company per year; (iii) the Tax Payment; (iv) by paid vacation and paid holidays; and (v) and other things such as the Insurance and additional benefits.

282.    Under the terms of the Employment Agreement, Plaintiffs were terminated without cause and as such are additionally entitled to payment of, including but not limited to, the following: (i) Accrued Benefits as that term is defined in the Employment Agreement; (ii) Severance compensation; and (iii) continued coverage under the company sponsored health and disability plan with Swarthmore incurring the same out of pocket costs as in effect at the time of terminations.

283.    After announcing the cessation of Swarthmore's business operations on June 14, 2022, Nevels assured the employees that they would be paid all compensation due and owing until the company's closing.

284.    The Plaintiffs continued to work for Defendants, including assisting Swarthmore's clients in liquidating their accounts and transferring their assets to new money managers.

285.    Plaintiffs worked through the close of business on June 30, 2022, after which their employment was terminated by the Defendants.

286.    At the time the Plaintiffs were terminated by Defendants, their compensation under the Employment Agreement became due and owing.

287.    The Plaintiffs did not receive their earned income for the last pay period when it was typically paid to employees, on the last business day of the payroll period.

288.    Rather, not until August 2, 2022, did the Plaintiffs receive payment for the last payroll period from Swarthmore. This payment was untimely, and Swarthmore had no good faith basis for such tardy payment.

289.    To date, Plaintiff have not been paid the earned compensation due to them under the Employment Agreement, including but not limited to the Accrued Benefits, Severance compensation, fringe benefits, wage supplements, bonuses, and compensation through the Employment Term, all of which was earned.

290.    Defendants' failure to tender Plaintiffs the compensation due and owing to them, as well as the severance pay, bonuses, fringe benefits, wage supplements and Accrued Benefits, pursuant to the terms of the Employment Agreement was willful, intentional, and done in bad faith.

291.    By executing the Employment Agreement Nevels, on behalf of Swarthmore, as its Chairman and CEO, knew of, approved of, and agreed to, the final terms of the heavily negotiated Employment Agreement.

292.    Under the express terms of the Employment Agreement, Plaintiffs are entitled to payment of all unpaid wages due and owing, including but not limited to, their unpaid severance, bonuses, fringe benefits, wage supplements, the Tax Payment, and compensation through the Employment Term.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

293.    Nevels is a policy-making officer and interested owner of Swarthmore. Nevels is the active decision maker for Swarthmore, actively exercises the policy-making function in the company, and is the officer responsible for dealing with, and making decisions with respect to, *inter alia*, the hiring and firing of employees, the terms of the employment contracts, the expenditures of corporate funds, who gets paid, how much each employee is to be paid, employees' bonuses and benefits, etc.   Therefore, Nevels is personally liable for all unpaid wages and benefits owed to Plaintiff under the Employment Agreement.

294.    Not only did Nevels control the company, but he ceased its business operations without any consultation or consideration of the other shareholders.

295.    Although Plaintiffs worked from New York, the Pennsylvania Wage Payment and Collection Law ("WPCL") allows for recovery of unpaid wages for employees, even if they reside and/or work out of state.

296.    Despite being touted as executives of Swarthmore, Plaintiffs did not exercise any policy making functions in the company or have an active role in Swarthmore's decision-making process, as Nevels disregarded corporate structure and made all decisions regardless of the opinions of others.

297.    Plaintiffs presented Defendants with numerous policy suggestions that would dramatically improve Swarthmore's operations and productivity.

298.    Defendants failed to acknowledge, implement, or consider any of the suggestions made by Plaintiffs regarding Swarthmore's operations and productivity.

299.    Nevels managed the company as his alter ego and made unilateral decisions regarding all of Swarthmore's business operations.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

300.    Plaintiffs were mere employees at Swarthmore regardless of their title and the perception that Nevels presented to third parties.

301.    Indeed, at all relevant times, Nevels ensured that Plaintiffs were treated as, and were limited to engaging in functions as, mere employees.

302.    Plaintiffs are thereby owed compensation through the end of the Employment Term, bonuses, fringe benefits, wage supplements, the Tax Payment and severance pay, as a result of unpaid compensation that accrued as a result of their employment at Swarthmore and the Employment Agreement terms.

303.    Plaintiff suffered damages as a result of Defendants refusal to pay their unpaid wages through the Employment Term, fringe benefits, wage supplements, severance pay, bonuses, and the Tax Payment.

304.    Plaintiffs are also entitled to liquidated damages and attorney's fees pursuant to the statute.

305.    Plaintiff's damages are a natural and ordinary consequence as a result from Defendants' breach of the Employment Agreement, and/or Plaintiffs' damages were reasonably foreseeable and within the contemplation of the parties at the time they entered into the Employment Agreement.

**WHEREFORE**, Plaintiffs demand that the Court enter judgment in favor of each of the Plaintiffs and against Defendants on the fourth cause of action for violation of the WPCL in an amount to be determined at trial, but in no event less than $100,000, plus interest from June 14, 2022, at the statutory rate, all statutory costs and penalties and damages, attorney's fees, liquidated damages, and all further relief as this Court deems just and proper.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

## AS AND FOR A FIFTH CAUSE OF ACTION
### VIOLATION OF NEW YORK LABOR LAW
### As Against All Defendants

306.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 194 of this Complaint as though set forth fully herein.

307.    Pursuant to the terms of the Employment Agreement, Plaintiffs were each to be paid a base salary of $250,000 per annum.

308.    Pursuant to the terms of the Employment Agreement, Plaintiffs were to be further compensated by: (i) payment of a guaranteed bonus for each year of the Employment Term, in the amount not less than $109,000 per year; (ii) the issuance of 3.5% of Equity (valued at $126,000) in the company each year for each Plaintiff; (iii) the Tax Payment; (iv) paid vacation and certain holidays; and (v) other things such as the Insurance and additional benefits.

309.    Pursuant to the terms of the Employment Agreement, Plaintiffs were terminated without cause and as such are additionally entitled to payment of, including but not limited to, the following: (i) Accrued Benefits as that term is defined in the Employment Agreement; (ii) Severance compensation; and (iii) continued coverage under the company sponsored health and disability plan with Swarthmore incurring the same out of pocket costs as in effect at the time of terminations.

310.    After announcing the cessation of Swarthmore's business operations on June 14, 2022, Nevels assured the employees that they would be paid all compensation due and owing until the company's closing.

311.    The Plaintiffs continued to work for Defendants, including assisting Swarthmore's clients in liquidating their accounts and transferring their assets to new money managers.

312.    Plaintiffs worked through the close of business on June 30, 2022, after which their employment was terminated by the Defendants.

313.    At the time the Plaintiffs were terminated by Defendants, their compensation under the Employment Agreement became due and owing.

314.    The Plaintiffs did not receive their earned income for the last pay period when it was typically paid to employees, on the last business day of the payroll period.

315.    Rather, not until August 2, 2022, did the Plaintiffs receive payment for the last payroll period from Swarthmore. This payment was untimely, and Swarthmore had no good faith basis for such tardy payment.

316.    To date, Plaintiff have not been paid the earned compensation due to them under the Employment Agreement, including but not limited to the Accrued Benefits, Severance compensation, fringe benefits, wage supplements, bonuses, reimbursement expenses, and compensation through the Employment Term, all of which was earned.

317.    Defendants' failure to tender Plaintiffs the compensation due and owing to them, as well as the severance pay, bonuses, fringe benefits, wage supplements and Accrued Benefits, pursuant to the terms of the Employment Agreement was willful, intentional, and done in bad faith.

318.    By his execution of the Employment Agreement, Nevels, on behalf of Swarthmore, as its Chairman and CEO, knew of, approved of, and agreed to, the final terms of the heavily negotiated Employment Agreement.

319.    Under the express terms of the Employment Agreement, Plaintiffs are entitled to payment of all unpaid wages due and owing, including but not limited to, their unpaid severance, bonuses, fringe benefits, wage supplements, the Tax Payment, reimbursement expenses, and compensation through the Employment Term.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

320.    Nevels is a policy-making officer and interested owner of Swarthmore. Nevels is the active decision maker for Swarthmore, actively exercises the policy-making function in the company, and is the officer responsible for dealing with, and making decisions with respect to, *inter alia*, the hiring and firing of employees, the terms of the employment contracts, the expenditures of corporate funds, who gets paid, how much each employee is to be paid, employees' bonuses and benefits, etc.   Therefore, Nevels is personally liable for all unpaid wages and benefits owed to Plaintiff under the Employment Agreement.

321.    Plaintiffs are entitled to recover full wages, benefits, wage supplements, and liquidated damages that accrued prior to the commencement of this action per New York Labor Law § 198(3).

322.    Additionally, Plaintiffs are entitled to recover the severance payment and the total compensation (and benefits) they are entitled to pursuant to the terms of the Employment Agreement, and reimbursement expenses.

323.    Defendants' failure to tender Plaintiffs the compensation due and owing to them, as well as the severance pay, pursuant to the terms of the Employment Agreement was willful, intentional, and done in bad faith.

324.    Defendants' willful refusal to tender to Plaintiffs the wages and severance pay due and owing to them pursuant to the Employment Agreement was, among other things, due to Nevel's direction to Swarthmore not to tender to Plaintiffs the amounts they are owed and entitled to pursuant to the Employment Agreement as a result of his personal vendetta against Plaintiffs.

325.    Nevels direction to Swarthmore not to pay Plaintiffs the wages and severance due and owing to them under their Employment Agreement was willful, intentional, and done in bad faith.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

326.    After his announcement of the cessation of Swarthmore's business operations, Nevels assured the employees, including Plaintiffs, that they would be paid all due compensation, including work they would perform through the close of the business' operations.

327.    To date, Plaintiffs have yet to be paid all due compensation up to and including the date Swarthmore ceased business operations.

328.    To date, Plaintiffs have not received any portion of the pay and severance they are entitled to under the Employment Agreement.

329.    On June 15, 2022, Plaintiffs sent a demand letter to Defendants, in which they demanded that Defendants comply with the terms of the Employment Agreement, among other things, tender payment for all unpaid wages and severance.

330.    Defendants willfully disregarded Plaintiffs' good faith efforts to remedy the situation.

331.    As such, Plaintiffs are entitled to all unpaid compensation accrued up to and including the date Swarthmore ceased business operations.

332.    Plaintiffs are also entitled to severance pay pursuant to the terms of the Employment Agreement.

333.    Moreover, Plaintiffs are entitled to liquidated damages under New York Labor Law in the amount equal to one hundred percent of any underpayment along with the right to recover their attorney's fees and costs incurred in enforcing any court judgment.

**WHEREFORE**, Plaintiffs demand that the Court enter judgment in favor of each of the Plaintiffs and against Defendants on the fifth cause of action for violation of the New York Labor Laws in an amount to be determined at trial, but in no event less than $100,000, plus interest from

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

June 14, 2022 at the statutory rate, all statutory costs and damages and penalties, attorney's fees,

liquidated damages, and all further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all causes of action in this matter.

**RESERVATION OF RIGHT TO AMEND**

Plaintiffs reserve the right to amend this Complaint as they deem necessary and/or

appropriate.

Dated: New York, New York
      September 7, 2022

                          DAVIDOFF LAW FIRM, PLLC

By:       ***/JMD/***
                          Jonathan Marc Davidoff, Esq. (#JD9157)
                          Danielle Shayne Shapero, Esq.
                          *Attorneys for Plaintiffs*
                          228 East 45th Street
                          Suite 1110
                          New York, New York 10017
                          Tel: (212)-587-5971
                          Jonathan@DavidoffLawFirm.com
                          Danielle@ DavidoffLawFirm.com

Exhibit "A"

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made effective as of January 19, 2021 (the "Effective Date"), by and between THE SWARTHMORE GROUP, INC. (the "Company"), and Steven Neal Schweitzer (the "Executive")

WHEREAS, the Company desires to employ Executive, and Executive wishes to be employed by the Company, on the terms and conditions specified herein;

NOW, THEREFORE, the parties agree as follows:

1.    Employment. The Company hereby employs Executive upon the terms and conditions set forth in this Agreement.

2.    Position and Duties.

(a)    Executive shall serve as the Company's – Senior Fixed Income Portfolio Manager.

(b)    During the Employment Term, Executive shall report to James E. Nevels (the "Principal").

(c)    The Executive shall have such duties, authorities and responsibilities that are commensurate with the duties, authorities and responsibilities of persons in similar operations and capacities in similarly sized companies generally and otherwise mutually agreed upon by Executive and the Principal from time to time. The Executive's duties will include, (i) providing portfolio management services to clients, (ii) constructing and monitoring fixed income portfolios, (iii) serving on investment related committees of the Company as required by the Principal, (iv) performing investment and security analysis to support the Company's fixed income strategy, and other related duties to enhance the Company's relationships with its clients and expand its client base. The Executive agrees to perform such duties and services for the Company diligently, competently, in a good faith manner and to the best of Executive's ability and, subject to the exceptions provided under Section 2(d) below, agrees to devote Executive's full working time and attention to the service of the Company.

(d)    Exclusivity. The Executive shall devote Executive's full working time and attention to the business and affairs of the Company; provided, however, that the Executive shall not be restricted from pursuing the following activities, so long as such activities do not unreasonably interfere with Executive's duties hereunder: (i) providing services to charitable or professional organizations, and (ii) managing personal investments, provided that Executive will comply with all policies and procedures of the Company regarding personal trading activity, or (iii) such other business activities as may be approved, in advance, by the Principal.

(e)    Location. The Executive shall have an office in the offices of the Company in the Philadelphia metropolitan area but shall be permitted to work remotely. The Executive agrees to reasonable travel as necessary to fulfill the requirements of his position.

3.    Term. The employment term shall begin on January 19, 2021 (the "Commencement Date") and continue for a period of two (2) consecutive years unless earlier terminated as provided herein (the "Employment Term"). In the event that the Company does not intend to continue the employment relationship upon the same or similar terms beyond the Employment Term, the Company agrees to provide notice to the Executive of such intent not later than ninety (90) calendar days prior to the expiration of the Employment Term. A decision by the Company to not renew the Agreement under the same or similar terms (except with respect to the Equity Bonus which shall be subject to negotiation between the parties) shall be considered a Termination without Cause for purposes of Section 5(c).

4.    Compensation.

(a)    Base Salary. During the Employment Term, Executive will receive an annual base salary (the "Base Salary") equal to $250,000 per annum. The Executive's Base Salary, may be increased from time to time in the sole discretion of the Principal. Executive's Base Salary will be payable in installments in accordance with the Company's customary payroll practice and policy, and shall be subject to such payroll deductions as are required by law and applicable benefit programs.

(b)    Bonus. For each year of the Employment Term, Executive will receive a bonus of no less than the amount of $109,000, less appropriate deductions and withholdings, to be paid at the time such bonuses are customarily paid to similarly-situated employees but not sooner than January 1 and not later than March 31 of the calendar year following the year in which the Bonus was earned. For each year of the Employment Term, any bonus in excess of the amount of $109,000 per year may be paid to the Executive at the sole discretion of the Principal based upon goals to be set between the Executive and the Principal in January of each year.

(c)    Equity Bonus. On September 1, 2021 and on September 1, 2022, assuming the Executive is employed by the Company on such dates, the Company will issue to Executive shares of common stock of the Company (the "Shares") that have a value of $126,000. The Shares shall be subject to all of the terms and conditions of the Shareholders' Agreement dated as of June 1, 2001 (the "Shareholders' Agreement") and any amendments thereto. For each year in which Shares are granted to Executive, the Company will also provide Executive with an additional cash payment which, after deduction for all taxes, equals the aggregate taxes excluding federal income taxes, but including Social Security and Medicare taxes, payable by Executive in connection with the grant of the Shares and will be computed using the highest combined state and local tax rate for individual taxpayers in effect on the date the Shares are required to be issued under this Section 4(c) ("Tax Payment"). The Tax Payment shall be paid to Executive no later than March 15th of the calendar year following the year in which Shares are required to be issued.

(d)    Benefits. During the Term, Executive shall be permitted to participate in such insurance, benefit and retirement plans or programs now existing or established hereafter for the benefit of the Company's similarly-situated employees, subject to the terms of any such plan or program. Currently, available benefits include medical, vision, dental, life, long-term

2

disability insurance. Effective April 1, 2021 Executive will be eligible for participation in the Company's 401k plan.

(e)     Expenses. Executive is authorized to incur reasonable expenses in the discharge of the services to be performed hereunder in accordance with the Company's expense reimbursement policies, as the same may be modified by the Company from time to time (the "Reimbursement Policies"). Subject to the provisions of Section 10(b) below (Section 409A Compliance), the Company shall reimburse Executive for all such proper expenses, including reasonable expenses in connection required travel (including hotel or corporate housing) to Philadelphia, upon presentation by Executive of itemized accounts of such expenditures in accordance with the terms of the Reimbursement Policies.

(f)     Vacation. Executive will receive paid time off, of twenty-five (25) days, in accordance with Company policy for executive employees. Paid holidays will be given in accordance with Company policy and applicable state and local law.

5.     Termination.

(a)     Generally. The Company and/or the Executive may terminate Executive's employment (thereby terminating the Employment Term contemplated in Section 3) for any of the following reasons:

i.     By Company for Cause. For purposes hereof, "Cause" means the occurrence of one of the following:

(1)     Fraud, embezzlement, dishonesty, or the taking of any action which constitutes self-dealing, or the acceptance or taking of any improper personal benefit in the performance of Executive's duties hereunder;

(2)     Conviction by a court of competent jurisdiction of, or entering a Plea of guilty or no contest to, any crime, whether or not relating to Executive employment, which constitutes a felony or involves moral turpitude (excluding traffic-related offenses), or which has, as an element, fraud, dishonesty or the conversion or property; or

(3)     Misappropriation of money or property of the Company or its affiliates by Executive, or the acceptance of any unlawful bribe or kickback with respect to the Company's business; or

(4)     Breach of any of Executive's fiduciary duties of loyalty as an officer or director of the Company; or

(5)     Habitual or willful material neglect of duties or failure to comply with the reasonable and lawful directives of the Company's Board of Directors or the Principal; or

(6)     Knowing breach of any material provision of this Agreement. Notwithstanding the foregoing, the Company may not terminate Executive's employment for Cause without first providing Executive with written notice of the grounds for

termination for Cause and an opportunity to (within twenty one (-21) days from the delivery of such notice) present information to the Company to explain, refute or mitigate the alleged grounds for termination for Cause, at which time the Company may, in its sole discretion, either implement its decision to terminate for Cause or rescind its earlier notice.

        ii.    By the Company Due to Executive's Death or Disability. For purposes hereof, "Disability" means Executive's inability to substantially perform his normal duties hereunder as a result of his physical or mental disability for either six (6) consecutive calendar months or a total of twelve (12) months, whether or not consecutive, during a period of twenty-four (24) consecutive months. Executive shall be deemed disabled on the first day of the month following the month in which the period of time established under this Section 5(a)(ii) has elapsed.

        iii.    By Executive for Good Reason. For purposes of this Agreement, "Good Reason" means the occurrence of one of the following without Executive's written consent:

        (1)    a reduction of Executive's Base Salary, Bonus, Equity Bonus without Executive's agreement, or a material breach by the Company of any of the other provisions of Section 4 herein;

        (2)    a material alteration of Executive's position, authority or responsibilities without Executive's agreement; or

        (3)    a change in the reporting relationship such that Executive does not report to the Principal and/or the Principal ceases to serve as the Chairman and Chief Executive Officer of the Company.

Good Reason shall not exist hereunder unless Executive first provides twenty-one (21) days prior written notice to the Principal which notice alleges the occurrence of one of the aforementioned events in specific detail and provide the Company with an additional twenty-one (21) days to cure the circumstances giving rise to Good Reason.

        (b)    Payments Upon Termination other than by the Company without Cause or the Executive for Good Reason. Upon any termination of the Employment Term with the Company (other than by the Company without Cause or by Executive for Good Reason), Executive shall be paid any unpaid Base Salary due and owing for periods prior to the termination, reimbursement for expenses reasonably and necessarily incurred during Executive's employment in accordance with Section 2(e) and the proceeds of other life insurance, disability insurance or other benefits payable to Executive under the terms and conditions of any applicable policies and/or employee benefit plans, including with respect to any Shares pursuant to the terms of the Shareholder Agreement (all of the foregoing collectively, the "Accrued Benefits").

        (c)    Payments Upon a Termination by the Company without Cause or by the Executive for Good Reason. Upon the termination of the Employment Term by the Company without Cause or by Executive for Good Reason, Executive shall be paid or provided, as the case may be: (i) the Accrued Benefits; ), (ii) severance compensation for the period of four (4) months (the "Severance Period") in the amount of the Base Salary in effect immediately prior to the date

4

of notice of termination; and (iii) continued coverage under any Company sponsored health and disability plan during the Severance Period, to the extent that Executive otherwise qualifies for post-termination coverage, with each party incurring the same out-of-pocket costs as in effect at the time of termination during the Severance Period. The amounts provided for in subsection (ii) and (iii) shall be paid to Executive ratably over the Severance Period in accordance with the Company's normal payroll practices commencing on the first payroll date following the Executive's date of termination. All other payments, if any, hereunder shall be payable on the dates on which they would have been paid had Executive continued employment hereunder.

(d)    Notice of Termination.  Any purported termination by the Company for Cause or termination by the Executive for Good Reason will be communicated by a written Notice of Termination to the other.  For purposes of this Agreement, a "Notice of Termination" will mean a notice which indicates the specific termination provision in this Agreement relied upon and will, with respect to a termination for Cause or Good Reason, set forth in reasonable detail the facts and circumstances claimed to provide a basis for such termination of the Executive's employment under the provision so indicated.

(e)    Termination Date.  "Termination Date" will mean in the case of the Executive's death, the date of death; in the case of non-renewal of the Agreement pursuant to Section 3, the date the term of the Agreement expires pursuant to Section 3; and in all other cases, the date specified in the Notice of Termination.

6.    Company Property.  Executive agrees that all Confidential Information, trade secrets, drawings, designs, reports, computer programs or data, books, handbooks, manuals, files (electronic or otherwise), computerized storage media, papers, memoranda, letters, notes, photographs, facsimile, software, computers, and other documents (electronic or otherwise), materials and equipment of any kind that Executive has acquired or will acquire during the course of Executive's employment with the Company are and remain the property of the Company.  Upon termination of employment with the Company, or sooner if requested by the Company, Executive agrees to return all such documents, materials and records to the Company and not to make or retain copies of the same without the prior written consent of the Company.

7.    Confidential Information.  Executive recognizes and acknowledges that by reason of the Executive's employment by and service with the Company, Executive has had and/or will have access to confidential information of the Company and its parents, subsidiaries and affiliates, including, without limitation, computer programs and data, financial projections and similar data relating to customers and entities with respect to which the Company is researching, statements, budgets, terms of business, client lists, mailing lists, proposals, lists of outside resources (such as free-lancers or outside contractors) and vendor lists ("Confidential Information"). Executive acknowledges that such Confidential Information is a valuable and unique asset of the Company and agrees that Executive will not, either during employment or any time after the termination of employment, disclose Confidential Information to any person for any reason whatsoever (except as the Employee's duties as an employee of the Company may require) without the prior written authorization of the Principal, unless such information is in the public domain through no fault of the Executive or except as may be required by law, subpoena or the order of a court or other body having jurisdiction over the matter.  18 U.S.C. § 1833(b) states: "An individual shall not be held criminally or civilly liable under any Federal or

5

State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Accordingly, notwithstanding the foregoing, Executive has the right to disclose in confidence trade secrets to Federal, State, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. Executive also the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Further notwithstanding the foregoing, nothing contained herein shall prohibit Executive from filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under applicable law or regulation.

8.    Restrictive Covenants.  At all times during the Executive's employment with the Company, and for a period of three (3) years after the termination of his employment with the Company, the Executive shall comply with the following restrictions:

(a)    The Executive shall not directly or indirectly encourage or solicit any employee, consultant or independent contractor to leave the employment or service of the Company or any affiliate for any reason or interfere in any other manner with any employment or service relationships at the time existing between the Company or any affiliate and its employees, consultants and independent contractors. For purposes of clarity, this provision shall not include any interactions between Steven Schweitzer and William Scott Mero.

9.    Non-Disclosure.  At no time during the term of this Agreement or thereafter shall Executive disclose Confidential Information.  Notwithstanding the preceding, nothing in this Agreement shall in any way limit the ability of the Executive to provide information covered by this Agreement to a federal or state government department or agency to assist such entity in the fulfillment of its duties.

10.    Injunctive Relief.  The Executive expressly agrees that the covenants set forth in Sections 8 and 9 of this Agreement are reasonable and necessary to protect the Company and its legitimate business interests, and to prevent the unauthorized dissemination of Proprietary Information to competitors of the Company.  The Executive also agrees that the Company will be irreparably harmed and that damages alone cannot adequately compensate the Company if there is a violation of Sections 8 or 9 of this Agreement by the Executive, and that injunctive relief against the Executive is essential for the protection of the Company.  Therefore, in the event of any such breach, it is agreed that, in addition to any other remedies available, the Company shall be entitled as a matter of right to injunctive relief in any court of competent jurisdiction, without the necessity of posting a bond.

11.    Indemnification and Liability Insurance.  With respect to any action, suit or proceeding to which Executive may be made a party by reason of Executive's being or having been an officer or employee of the Company (other than any dispute, claim or controversy

6

arising under or relating to this Agreement), Company shall indemnify, defend and hold harmless Executive and cover Executive under any liability insurance policies of the Company. The provision of indemnification in this Section 8 shall expressly survive the termination of the Employment Term or this Agreement.

    12.   <u>Representations Regarding Prior Work and Legal Obligations.</u>

        (a)   Executive represents and warrants that Executive has no agreement or other legal obligation with any prior employer, or any other person or entity that restricts Executive's ability to accept employment with the Company. Executive further represents and warrants that Executive is not a party to any agreement (including, without limitation, a non-competition, non-solicitation, no hire or similar agreement) and has no other legal obligation that restricts in any way Executive's ability to perform Executive's duties and satisfy Executive's other obligations to the Company, including, without limitation, those under this Agreement.

        (b)   Executive represents and acknowledges that he has been instructed by the Company that at no time should he divulge to or use for the benefit of the Company any trade secret or confidential or proprietary information of any previous employer or entity with which Executive was affiliated or of any other third-party. Executive expressly represents and warrants that Executive has not divulged or used any such information for the benefit of the Company and will not do so.

    13.   <u>Miscellaneous Provisions.</u>

        (a)   <u>IRCA Compliance</u>. This Agreement, and Executive's employment with the Company, is conditioned on Executive's establishing Executive's identity and authorization to work as required by the Immigration Reform and Control Act of 1986 (IRCA).

        (b)   <u>Section 409A Compliance</u>. Unless otherwise expressly provided, any payment of compensation by Company to Executive, whether pursuant to this Agreement or otherwise, shall be made no later than the 15th day of the third month (*i.e.*, 2½ months) after the later of the end of the calendar year or the Company's fiscal year in which Executive's right to such payment vests (*i.e.*, is not subject to a "substantial risk of forfeiture" for purposes of Section 409A of the Internal Revenue Code of 1986, as amended ("<u>Section 409A</u>"). For purposes of this *letter agreement*, termination of employment shall be deemed to occur only upon "separation from service" as such term is defined under Section 409A. Each payment and each installment of any severance payments provided for under this Agreement shall be treated as a separate payment for purposes of application of Section 409A. To the extent any amounts payable by the Company to the Executive constitute "nonqualified deferred compensation" (within the meaning of Section 409A) such payments are intended to comply with the requirements of Section 409A, and shall be interpreted in accordance therewith. Neither party individually or in combination may accelerate, offset or assign any such deferred payment, except in compliance with Section 409A. No amount shall be paid prior to the earliest date on which it is permitted to be paid under Section 409A and Employee shall have no discretion with respect to the timing of payments except as permitted under Section 409A. Any Section 409A payments which are subject to execution of a waiver and release which may be executed and/or revoked in a calendar year following the calendar year in which the payment event (such as termination of employment)

occurs shall commence payment only in the calendar year in which the release revocation period ends as necessary to comply with Section 409A. All expense reimbursement or in-kind benefits subject to Section 409A provided under this Agreement or, unless otherwise specified in writing, under any Company program or policy, shall be subject to the following rules: (i) the amount of expenses eligible for reimbursement or in-kind benefits provided during one calendar year may not affect the benefits provided during any other year; (ii) reimbursements shall be paid no later than the end of the calendar year following the year in which the Executive incurs such expenses, and the Executive shall take all actions necessary to claim all such reimbursements on a timely basis to permit the Company to make all such reimbursement payments prior to the end of said period; and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit. Notwithstanding anything herein to the contrary, no amendment may be made to this Agreement if it would cause the Agreement or any payment hereunder not to be in compliance with Code Section 409A. Except as set forth in this Section 13(b) or to the extent that any 409A violation was caused by the Company, the Company shall not have any other obligation to take any action to prevent the assessment of any excise tax or penalty on Executive under Section 409A and the Company will not have any liability to Executive for such tax or penalty. To the extent that the Company is the cause of any 409A violation, the Company shall pay the Executive's excise tax and pay an additional amount to Executive to cover the gross up for any such excise tax.

(c)     Assignability and Binding Effect. This Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors and legal representatives of Executive, and shall inure to the benefit of and be binding upon the Company and its successors and assigns, but the obligations of Executive are personal services and may not be delegated or assigned. This Agreement may be assigned by the Company to a person or entity that is an affiliate or a successor in interest to substantially all of the business operations of the Company. Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such affiliate or successor person or entity.

(d)     Severability. If any provision of this Agreement is held to be invalid, the remaining provisions shall remain in full force and effect. However, if any court determines that any covenant in this Agreement, is unenforceable because the duration, geographic scope or restricted activities thereof are overly broad, then such provision or part thereof shall be modified by reducing the overly broad duration, geographic scope or restricted activities by the minimum amount so as to make the covenant, in its modified form, enforceable.

(e)     Choice of Law. This Agreement shall be interpreted and enforced in accordance with the laws of the State of Pennsylvania, without regard to its conflict-of-law principles.

(f)     Notices.

i.      Any notice or other communication under this Agreement shall be in writing and shall be delivered by hand, email, facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid:

8

(1)     If to Executive, to Executive's address on the books and records of the Company, with a copy to Wendy Stryker, Esq. at wstryker@fkks.com.

(2)     If to the Company, to the Principal or at such other mailing address, email address or facsimile number as it may have furnished in writing to Executive, with a copy to Michael Hanlon, Esq. at MHanlon@cozen.com.

ii.     Any notice so addressed shall be deemed to be given: if delivered by hand, email or facsimile, on the date of such delivery; if mailed by overnight courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

(g)     Interpretation. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any Party. The Parties acknowledge that both of them have participated in drafting this Agreement; therefore, any general rule of construction that any ambiguity shall be construed against the drafter shall not apply to this Agreement. In this Agreement, unless the context otherwise requires, the masculine, feminine and neuter genders and the singular and the plural include one another.

(h)     Further Assurances. The Parties will execute and deliver such further documents and instruments and will take all other actions as may be reasonably required or appropriate to carry out the intent and purposes of this Agreement.

(i)     Entire Agreement. This Agreement constitutes the entire understanding and agreement of the Parties concerning the subject matter hereof, and it supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements regarding such subject matter. The Company and Executive each acknowledges and agrees that it/he is not relying on, and it/he may not rely on, any oral or written representation of any kind that is not set forth in writing in this Agreement.

(j)     Waivers and Amendments. This Agreement may be altered, amended, modified, superseded or canceled, and the terms hereof may be waived, only by a written instrument signed by the Parties or, in the case of a waiver, by the Party alleged to have waived compliance. Any such signature of the Company must be by an authorized signatory for the Company. No delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

(k)     Counterparts. This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic copies and other facsimiles of this Agreement or of such signed counterparts may be used in lieu of the originals for any purpose.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date.

THE SWARTHMORE GROUP, INC.

By: _____

Name: _James G. Nevels_

Title: _Chairman & CEO_

_____

STEVEN NEAL SCHWEITZER

10

Exhibit "B"

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made effective as of January 19, 2021 (the "Effective Date"), by and between THE SWARTHMORE GROUP, INC. (the "Company"), and William Scott Mero (the "Executive")

WHEREAS, the Company desires to employ Executive, and Executive wishes to be employed by the Company, on the terms and conditions specified herein;

NOW, THEREFORE, the parties agree as follows:

1.     Employment. The Company hereby employs Executive upon the terms and conditions set forth in this Agreement.

2.     Position and Duties.

(a)     Executive shall serve as the Company's – Senior Fixed Income Portfolio Manager.

(b)     During the Employment Term, Executive shall report to James E. Nevels (the "Principal").

(c)     The Executive shall have such duties, authorities and responsibilities that are commensurate with the duties, authorities and responsibilities of persons in similar operations and capacities in similarly sized companies generally and otherwise mutually agreed upon by Executive and the Principal from time to time. The Executive's duties will include, (i) providing portfolio management services to clients, (ii) constructing and monitoring fixed income portfolios, (iii) serving on investment related committees of the Company as required by the Principal, (iv) performing investment and security analysis to support the Company's fixed income strategy, and other related duties to enhance the Company's relationships with its clients and expand its client base. The Executive agrees to perform such duties and services for the Company diligently, competently, in a good faith manner and to the best of Executive's ability and, subject to the exceptions provided under Section 2(d) below, agrees to devote Executive's full working time and attention to the service of the Company.

(d)     Exclusivity. The Executive shall devote Executive's full working time and attention to the business and affairs of the Company; provided, however, that the Executive shall not be restricted from pursuing the following activities, so long as such activities do not unreasonably interfere with Executive's duties hereunder: (i) providing services to charitable or professional organizations, and (ii) managing personal investments, provided that Executive will comply with all policies and procedures of the Company regarding personal trading activity, or (iii) such other business activities as may be approved, in advance, by the Principal.

(e)     Location. The Executive shall have an office in the offices of the Company in the Philadelphia metropolitan area but shall be permitted to work remotely. The Executive agrees to reasonable travel as necessary to fulfill the requirements of his position.

LEGAL\50286599\4

Case 2:23-cv-01556-CMR Document 30 Filed 09/07/22 19 Page 68 of 80

3. **Term.** The employment term shall begin on January 19, 2021 (the "Commencement Date") and continue for a period of two (2) consecutive years unless earlier terminated as provided herein (the "Employment Term"). In the event that the Company does not intend to continue the employment relationship upon the same or similar terms beyond the Employment Term, the Company agrees to provide notice to the Executive of such intent not later than ninety (90) calendar days prior to the expiration of the Employment Term. A decision by the Company to not renew the Agreement under the same or similar terms (except with respect to the Equity Bonus which shall be subject to negotiation between the parties) shall be considered a Termination without Cause for purposes of Section 5(c).

4. Compensation.

(a) Base Salary. During the Employment Term, Executive will receive an annual base salary (the "Base Salary") equal to $250,000 per annum. The Executive's Base Salary, may be increased from time to time in the sole discretion of the Principal. Executive's Base Salary will be payable in installments in accordance with the Company's customary payroll practice and policy, and shall be subject to such payroll deductions as are required by law and applicable benefit programs.

(b) Bonus. For each year of the Employment Term, Executive will receive a bonus of no less than the amount of $109,000, less appropriate deductions and withholdings, to be paid at the time such bonuses are customarily paid to similarly-situated employees but not sooner than January 1 and not later than March 31 of the calendar year following the year in which the Bonus was earned. For each year of the Employment Term, any bonus in excess of the amount of $109,000 per year may be paid to the Executive at the sole discretion of the Principal based upon goals to be set between the Executive and the Principal in January of each year.

(c) Equity Bonus. On September 1, 2021 and on September 1, 2022, assuming the Executive is employed by the Company on such dates, the Company will issue to Executive shares of common stock of the Company (the "Shares") that have a value of $126,000. The Shares shall be subject to all of the terms and conditions of the Shareholders' Agreement dated as of June 1, 2001 (the "Shareholders' Agreement") and any amendments thereto. For each year in which Shares are granted to Executive, the Company will also provide Executive with an additional cash payment which, after deduction for all taxes, equals the aggregate taxes excluding federal income taxes, but including Social Security and Medicare taxes, payable by Executive in connection with the grant of the Shares and will be computed using the highest combined state and local tax rate for individual taxpayers in effect on the date the Shares are required to be issued under this Section 4(c) ("Tax Payment"). The Tax Payment shall be paid to Executive no later than March 15th of the calendar year following the year in which Shares are required to be issued.

(d) Benefits. During the Term, Executive shall be permitted to participate in such insurance, benefit and retirement plans or programs now existing or established hereafter for the benefit of the Company's similarly-situated employees, subject to the terms of any such plan or program. Currently, available benefits include medical, vision, dental, life, long-term

disability insurance. Effective April 1, 2021 Executive will be eligible for participation in the Company's 401k plan.

(e) <u>Expenses</u>. Executive is authorized to incur reasonable expenses in the discharge of the services to be performed hereunder in accordance with the Company's expense reimbursement policies, as the same may be modified by the Company from time to time (the "Reimbursement Policies"). Subject to the provisions of Section 10(b) below (Section 409A Compliance), the Company shall reimburse Executive for all such proper expenses, including reasonable expenses in connection required travel (including hotel or corporate housing) to Philadelphia, upon presentation by Executive of itemized accounts of such expenditures in accordance with the terms of the Reimbursement Policies.

(f) <u>Vacation</u>. Executive will receive paid time off, of twenty-five (25) days, in accordance with Company policy for executive employees. Paid holidays will be given in accordance with Company policy and applicable state and local law.

5. <u>Termination</u>.

(a) <u>Generally</u>. The Company and/or the Executive may terminate Executive's employment (thereby terminating the Employment Term contemplated in Section 3) for any of the following reasons:

i. <u>By Company for Cause</u>. For purposes hereof, "Cause" means the occurrence of one of the following:

(1) Fraud, embezzlement, dishonesty, or the taking of any action which constitutes self-dealing, or the acceptance or taking of any improper personal benefit in the performance of Executive's duties hereunder;

(2) Conviction by a court of competent jurisdiction of, or entering a Plea of guilty or no contest to, any crime, whether or not relating to Executive employment, which constitutes a felony or involves moral turpitude (excluding traffic-related offenses), or which has, as an element, fraud, dishonesty or the conversion or property; or

(3) Misappropriation of money or property of the Company or its affiliates by Executive, or the acceptance of any unlawful bribe or kickback with respect to the Company's business; or

(4) Breach of any of Executive's fiduciary duties of loyalty as an officer or director of the Company; or

(5) Habitual or willful material neglect of duties or failure to comply with the reasonable and lawful directives of the Company's Board of Directors or the Principal; or

(6) Knowing breach of any material provision of this Agreement. Notwithstanding the foregoing, the Company may not terminate Executive's employment for Cause without first providing Executive with written notice of the grounds for

3

termination for Cause and an opportunity to (within twenty one (-21) days from the delivery of such notice) present information to the Company to explain, refute or mitigate the alleged grounds for termination for Cause, at which time the Company may, in its sole discretion, either implement its decision to terminate for Cause or rescind its earlier notice.

           ii.     By the Company Due to Executive's Death or Disability. For purposes hereof, "Disability" means Executive's inability to substantially perform his normal duties hereunder as a result of his physical or mental disability for either six (6) consecutive calendar months or a total of twelve (12) months, whether or not consecutive, during a period of twenty-four (24) consecutive months. Executive shall be deemed disabled on the first day of the month following the month in which the period of time established under this Section 5(a)(ii) has elapsed.

           iii.     By Executive for Good Reason. For purposes of this Agreement, "Good Reason" means the occurrence of one of the following without Executive's written consent:

           (1)     a reduction of Executive's Base Salary, Bonus, Equity Bonus without Executive's agreement, or a material breach by the Company of any of the other provisions of Section 4 herein;

           (2)     a material alteration of Executive's position, authority or responsibilities without Executive's agreement; or

           (3)     a change in the reporting relationship such that Executive does not report to the Principal and/or the Principal ceases to serve as the Chairman and Chief Executive Officer of the Company.

     Good Reason shall not exist hereunder unless Executive first provides twenty-one (21) days prior written notice to the Principal which notice alleges the occurrence of one of the aforementioned events in specific detail and provide the Company with an additional twenty-one (21) days to cure the circumstances giving rise to Good Reason.

         (b)     Payments Upon Termination other than by the Company without Cause or the Executive for Good Reason. Upon any termination of the Employment Term with the Company (other than by the Company without Cause or by Executive for Good Reason), Executive shall be paid any unpaid Base Salary due and owing for periods prior to the termination, reimbursement for expenses reasonably and necessarily incurred during Executive's employment in accordance with Section 2(e) and the proceeds of other life insurance, disability insurance or other benefits payable to Executive under the terms and conditions of any applicable policies and/or employee benefit plans, including with respect to any Shares pursuant to the terms of the Shareholder Agreement (all of the foregoing collectively, the "Accrued Benefits").

         (c)     Payments Upon a Termination by the Company without Cause or by the Executive for Good Reason. Upon the termination of the Employment Term by the Company without Cause or by Executive for Good Reason, Executive shall be paid or provided, as the case may be: (i) the Accrued Benefits; ), (ii) severance compensation for the period of four (4) months (the "Severance Period") in the amount of the Base Salary in effect immediately prior to the date

4

of notice of termination; and (iii) continued coverage under any Company-sponsored health and disability plan during the Severance Period, to the extent that Executive otherwise qualifies for post-termination coverage, with each party incurring the same out-of-pocket costs as in effect at the time of termination during the Severance Period. The amounts provided for in subsection (ii) and (iii) shall be paid to Executive ratably over the Severance Period in accordance with the Company's normal payroll practices commencing on the first payroll date following the Executive's date of termination. All other payments, if any, hereunder shall be payable on the dates on which they would have been paid had Executive continued employment hereunder.

(d)     Notice of Termination. Any purported termination by the Company for Cause or termination by the Executive for Good Reason will be communicated by a written Notice of Termination to the other. For purposes of this Agreement, a "Notice of Termination" will mean a notice which indicates the specific termination provision in this Agreement relied upon and will, with respect to a termination for Cause or Good Reason, set forth in reasonable detail the facts and circumstances claimed to provide a basis for such termination of the Executive's employment under the provision so indicated.

(e)     Termination Date. "Termination Date" will mean in the case of the Executive's death, the date of death; in the case of non-renewal of the Agreement pursuant to Section 3, the date the term of the Agreement expires pursuant to Section 3; and in all other cases, the date specified in the Notice of Termination.

6.     Company Property. Executive agrees that all Confidential Information, trade secrets, drawings, designs, reports, computer programs or data, books, handbooks, manuals, files (electronic or otherwise), computerized storage media, papers, memoranda, letters, notes, photographs, facsimile, software, computers, and other documents (electronic or otherwise), materials and equipment of any kind that Executive has acquired or will acquire during the course of Executive's employment with the Company are and remain the property of the Company. Upon termination of employment with the Company, or sooner if requested by the Company, Executive agrees to return all such documents, materials and records to the Company and not to make or retain copies of the same without the prior written consent of the Company.

7.     Confidential Information. Executive recognizes and acknowledges that by reason of the Executive's employment by and service with the Company, Executive has had and/or will have access to confidential information of the Company and its parents, subsidiaries and affiliates, including, without limitation, computer programs and data, financial projections and similar data relating to customers and entities with respect to which the Company is researching, statements, budgets, terms of business, client lists, mailing lists, proposals, lists of outside resources (such as free-lancers or outside contractors) and vendor lists ("Confidential Information"). Executive acknowledges that such Confidential Information is a valuable and unique asset of the Company and agrees that Executive will not, either during employment or any time after the termination of employment, disclose Confidential Information to any person for any reason whatsoever (except as the Employee's duties as an employee of the Company may require) without the prior written authorization of the Principal, unless such information is in the public domain through no fault of the Executive or except as may be required by law, subpoena or the order of a court or other body having jurisdiction over the matter. 18 U.S.C. § 1833(b) states: "An individual shall not be held criminally or civilly liable under any Federal or

5

State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Accordingly, notwithstanding the foregoing, Executive has the right to disclose in confidence trade secrets to Federal, State, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. Executive also the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Further notwithstanding the foregoing, nothing contained herein shall prohibit Executive from filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under applicable law or regulation.

    .8.      Restrictive Covenants. At all times during the Executive's employment with the Company, and for a period of three (3) years after the termination of his employment with the Company, the Executive shall comply with the following restrictions:

    (a)      The Executive shall not directly or indirectly encourage or solicit any employee, consultant or independent contractor to leave the employment or service of the Company or any affiliate for any reason or interfere in any other manner with any employment or service relationships at the time existing between the Company or any affiliate and its employees, consultants and independent contractors. For purposes of clarity, this provision shall not include any interactions between Steven Schweitzer and William Scott Mero.

    9.      Non-Disclosure. At no time during the term of this Agreement or thereafter shall Executive disclose Confidential Information. Notwithstanding the preceding, nothing in this Agreement shall in any way limit the ability of the Executive to provide information covered by this Agreement to a federal or state government department or agency to assist such entity in the fulfillment of its duties.

    10.      Injunctive Relief. The Executive expressly agrees that the covenants set forth in Sections 8 and 9 of this Agreement are reasonable and necessary to protect the Company and its legitimate business interests, and to prevent the unauthorized dissemination of Proprietary Information to competitors of the Company. The Executive also agrees that the Company will be irreparably harmed and that damages alone cannot adequately compensate the Company if there is a violation of Sections 8 or 9 of this Agreement by the Executive, and that injunctive relief against the Executive is essential for the protection of the Company. Therefore, in the event of any such breach, it is agreed that, in addition to any other remedies available, the Company shall be entitled as a matter of right to injunctive relief in any court of competent jurisdiction, without the necessity of posting a bond.

    11.      Indemnification and Liability Insurance. With respect to any action, suit or proceeding to which Executive may be made a party by reason of Executive's being or having been an officer or employee of the Company (other than any dispute, claim or controversy

6

harmless Executive and cover Executive under any liability insurance policies of the Company. The provision of indemnification in this Section 8 shall expressly survive the termination of the Employment Term or this Agreement.

12.      <u>Representations Regarding Prior Work and Legal Obligations</u>.

(a)      Executive represents and warrants that Executive has no agreement or other legal obligation with any prior employer, or any other person or entity that restricts Executive's ability to accept employment with the Company. Executive further represents and warrants that Executive is not a party to any agreement (including, without limitation, a non-competition, non-solicitation, no hire or similar agreement) and has no other legal obligation that restricts in any way Executive's ability to perform Executive's duties and satisfy Executive's other obligations to the Company, including, without limitation, those under this Agreement.

(b)      Executive represents and acknowledges that he has been instructed by the Company that at no time should he divulge to or use for the benefit of the Company any trade secret or confidential or proprietary information of any previous employer or entity with which Executive was affiliated or of any other third-party. Executive expressly represents and warrants that Executive has not divulged or used any such information for the benefit of the Company and will not do so.

13.      <u>Miscellaneous Provisions</u>.

(a)      <u>IRCA Compliance</u>. This Agreement, and Executive's employment with the Company, is conditioned on Executive's establishing Executive's identity and authorization to work as required by the Immigration Reform and Control Act of 1986 (IRCA).

(b)      <u>Section 409A Compliance</u>. Unless otherwise expressly provided, any payment of compensation by Company to Executive, whether pursuant to this Agreement or otherwise, shall be made no later than the 15th day of the third month (*i.e.*, 2½ months) after the later of the end of the calendar year or the Company's fiscal year in which Executive's right to such payment vests (*i.e.*, is not subject to a "substantial risk of forfeiture" for purposes of Section 409A of the Internal Revenue Code of 1986, as amended ("<u>Section 409A</u>"). For purposes of this letter agreement, termination of employment shall be deemed to occur only upon "separation from service" as such term is defined under Section 409A. Each payment and each installment of any severance payments provided for under this Agreement shall be treated as a separate payment for purposes of application of Section 409A. To the extent any amounts payable by the Company to the Executive constitute "nonqualified deferred compensation" (within the meaning of Section 409A) such payments are intended to comply with the requirements of Section 409A, and shall be interpreted in accordance therewith. Neither party individually or in combination may accelerate, offset or assign any such deferred payment, except in compliance with Section 409A. No amount shall be paid prior to the earliest date on which it is permitted to be paid under Section 409A and Employee shall have no discretion with respect to the timing of payments except as permitted under Section 409A. Any Section 409A payments which are subject to execution of a waiver and release which may be executed and/or revoked in a calendar year following the calendar year in which the payment event (such as termination of employment)

occurs shall commence payment only in the calendar year in which the release revocation period ends as necessary to comply with Section 409A. All expense reimbursement or in-kind benefits subject to Section 409A provided under this Agreement or, unless otherwise specified in writing, under any Company program or policy, shall be subject to the following rules: (i) the amount of expenses eligible for reimbursement or in-kind benefits provided during one calendar year may not affect the benefits provided during any other year; (ii) reimbursements shall be paid no later than the end of the calendar year following the year in which the Executive incurs such expenses, and the Executive shall take all actions necessary to claim all such reimbursements on a timely basis to permit the Company to make all such reimbursement payments prior to the end of said period; and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit. Notwithstanding anything herein to the contrary, no amendment may be made to this Agreement if it would cause the Agreement or any payment hereunder not to be in compliance with Code Section 409A. Except as set forth in this Section 13(b) or to the extent that any 409A violation was caused by the Company, the Company shall not have any other obligation to take any action to prevent the assessment of any excise tax or penalty on Executive under Section 409A and the Company will not have any liability to Executive for such tax or penalty. To the extent that the Company is the cause of any 409A violation, the Company shall pay the Executive's excise tax and pay an additional amount to Executive to cover the gross up for any such excise tax.

(c)     Assignability and Binding Effect. This Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors and legal representatives of Executive, and shall inure to the benefit of and be binding upon the Company and its successors and assigns, but the obligations of Executive are personal services and may not be delegated or assigned. This Agreement may be assigned by the Company to a person or entity that is an affiliate or a successor in interest to substantially all of the business operations of the Company. Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such affiliate or successor person or entity.

(d)     Severability. If any provision of this Agreement is held to be invalid, the remaining provisions shall remain in full force and effect. However, if any court determines that any covenant in this Agreement, is unenforceable because the duration, geographic scope or restricted activities thereof are overly broad, then such provision or part thereof shall be modified by reducing the overly broad duration, geographic scope or restricted activities by the minimum amount so as to make the covenant, in its modified form, enforceable.

(e)     Choice of Law. This Agreement shall be interpreted and enforced in accordance with the laws of the State of Pennsylvania, without regard to its conflict-of-law principles.

(f)     Notices.

i.     Any notice or other communication under this Agreement shall be in writing and shall be delivered by hand, email, facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid:

8

occurs shall commence payment only in the calendar year in which the release revocation period ends as necessary to comply with Section 409A. All expense reimbursement or in-kind benefits subject to Section 409A provided under this Agreement or, unless otherwise specified in writing, under any Company program or policy, shall be subject to the following rules: (i) the amount of expenses eligible for reimbursement or in-kind benefits provided during one calendar year may not affect the benefits provided during any other year; (ii) reimbursements shall be paid no later than the end of the calendar year following the year in which the Executive incurs such expenses, and the Executive shall take all actions necessary to claim all such reimbursements on a timely basis to permit the Company to make all such reimbursement payments prior to the end of said period; and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit. Notwithstanding anything herein to the contrary, no amendment may be made to this Agreement if it would cause the Agreement or any payment hereunder not to be in compliance with Code Section 409A. Except as set forth in this Section 13(b) or to the extent that any 409A violation was caused by the Company, the Company shall not have any other obligation to take any action to prevent the assessment of any excise tax or penalty on Executive under Section 409A and the Company will not have any liability to Executive for such tax or penalty. To the extent that the Company is the cause of any 409A violation, the Company shall pay the Executive's excise tax and pay an additional amount to Executive to cover the gross up for any such excise tax.

      (c)    Assignability and Binding Effect. This Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors and legal representatives of Executive, and shall inure to the benefit of and be binding upon the Company and its successors and assigns, but the obligations of Executive are personal services and may not be delegated or assigned. This Agreement may be assigned by the Company to a person or entity that is an affiliate or a successor in interest to substantially all of the business operations of the Company. Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such affiliate or successor person or entity.

      (d)    Severability. If any provision of this Agreement is held to be invalid, the remaining provisions shall remain in full force and effect. However, if any court determines that any covenant in this Agreement, is unenforceable because the duration, geographic scope or restricted activities thereof are overly broad, then such provision or part thereof shall be modified by reducing the overly broad duration, geographic scope or restricted activities by the minimum amount so as to make the covenant, in its modified form, enforceable.

      (e)    Choice of Law. This Agreement shall be interpreted and enforced in accordance with the laws of the State of Pennsylvania, without regard to its conflict-of-law principles.

      (f)    Notices.

      i.    Any notice or other communication under this Agreement shall be in writing and shall be delivered by hand, email, facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid:

8

(1) If to Executive, to Executive's address on the books and records of the Company, with a copy to Wendy Stryker, Esq. at wstryker@fkks.com.

(2) If to the Company, to the Principal or at such other mailing address, email address or facsimile number as it may have furnished in writing to Executive, with a copy to Michael Hanlon, Esq. at MHanlon@cozen.com.

ii. Any notice so addressed shall be deemed to be given: if delivered by hand, email or facsimile, on the date of such delivery; if mailed by overnight courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

(g) Interpretation. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any Party. The Parties acknowledge that both of them have participated in drafting this Agreement; therefore, any general rule of construction that any ambiguity shall be construed against the drafter shall not apply to this Agreement. In this Agreement, unless the context otherwise requires, the masculine, feminine and neuter genders and the singular and the plural include one another.

(h) Further Assurances. The Parties will execute and deliver such further documents and instruments and will take all other actions as may be reasonably required or appropriate to carry out the intent and purposes of this Agreement.

(i) Entire Agreement. This Agreement constitutes the entire understanding and agreement of the Parties concerning the subject matter hereof, and it supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements regarding such subject matter. The Company and Executive each acknowledges and agrees that it/he is not relying on, and it/he may not rely on, any oral or written representation of any kind that is not set forth in writing in this Agreement.

(j) Waivers and Amendments. This Agreement may be altered, amended, modified, superseded or canceled, and the terms hereof may be waived, only by a written instrument signed by the Parties or, in the case of a waiver, by the Party alleged to have waived compliance. Any such signature of the Company must be by an authorized signatory for the Company. No delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

(k) Counterparts. This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic copies and other facsimiles of this Agreement or of such signed counterparts may be used in lieu of the originals for any purpose.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

THE SWARTHMORE GROUP, INC.

By:

Name: *James Nevels*

Title: *Chairman & CEO*

WILLIAM SCOTT MERO

10



**Jonathan Marc Davidoff, Esq.**
Admitted in New York and Florida
**Danielle Shayne Shapero, Esq.**
Admitted in New York

**DAVIDOFF LAW FIRM**

FLORIDA · NEW YORK

**Aaron R. Resnick, Esq.**
Admitted in Florida, of Counsel
**Derek A. Schwartz, Esq,**
Admitted in Florida, of Counsel

June 15, 2022

via Email Only (mhanlon@cozen.com)
The Swarthmore Group, Inc.
c/o Michael Hanlon, Esq.
Cozen O'Connor
1650 Market Street
Suite 2800
Philadelphia, PA 19103

  Re: Termination of Employment – Steven Schweitzer

Mr. Hanlon:

  This Firm represents Steven Schweitzer, a senior fixed income portfolio manager at The Swarthmore Group, Inc. ("Swarthmore") with respect to the termination notice Mr. Schweitzer received yesterday from James E. Nevels, the company's chairman and CEO. Please accept this letter as Mr. Schweitzer's demand that funds be placed in escrow to satisfy Swarthmore's obligations to Mr. Schweitzer pursuant to the employment agreement that was entered into on or about January 19, 2021 (the "Agreement").

  Yesterday, Mr. Nevels conducted an impromptu meeting in which he advised the employees that Swarthmore intended to cease conducting business on June 30, 2022 and that the investors' investments would be returned to them. Mr. Nevels' reasoning for the dismantling of Swarthmore is the deterioration of his and his wife's health. In fact, Mr. Nevels contends that the business must close within two weeks because he needs to move into a long-term care facility.

  Mr. Schweitzer agreed to continue his employment with Swarthmore pursuant to the terms and conditions set forth in the Agreement. In fact, when Mr. Schweitzer initially agreed to work at Swarthmore, he did so based on certain promises that were made by Mr. Nevels that was intended to provide Mr. Schweitzer with the ability to grow the company to levels that Mr. Nevels then refused to do. To say the least, Mr. Nevels did not honor these promises and representations, which resulted in stagnation of the company rather than growth.

  Mr. Nevels' termination of Mr. Schweitzer is without cause. Thus, pursuant to the terms of the Agreement, Mr. Schweitzer is to receive a prorata of his $250,000 annual salary for the months of July 2022, August 2022, September 2022 and October 2022 (approximately

---



228 East 45th Street
Suite 1110
New York, NY 10017
Tel: (212) 587-5971
Fax: (212) 658-9852

www.DavidoffLawFirm.com

100 North Biscayne Blvd
Suite 1607
Miami, FL 33132
Tel: (305) 672-7495
Fax: (305) 718-0647

$83,333.33). Additionally, the company is obligated to pay Mr. Schweitzer's health insurance and other benefits during this four-month period, including, but not limited to, contributions to his health savings account.  Mr. Schweitzer is also entitled to receive his annual bonus of at least $109,000 for the 2022 year and the equity bonus on September 1, 2022 with a value of at least $126,000. Also, the company is obligated to tender the proceeds of any life insurance, disability insurance or other benefits payable under the terms and conditions of any applicable policies and employee benefit plans, as well as compensation for unused vacation time.

Additionally, Mr. Schweitzer received an equity bonus on September 1, 2021 (and is due the same this year), which had a value of $126,000. At no time did Mr. Nevels conduct any meeting or discuss his plan to close Swarthmore's doors. Again, the cessation of business is solely a result of Mr. Nevels' personal situation, and frankly this baffles Mr. Schweitzer as the company has significant additional management talent other than Mr. Nevels. It seems that Mr. Nevels has and is operating Swarthmore as his alter ego. Therefore, pursuant to terms and conditions of the Agreement, the company is obligated to tender $252,000 (plus the payment of the taxes) for the return of the equity to the company, as Mr. Nevels has caused the cessation of Swarthmore as an ongoing business.

Finally, the company must tender the funds to pay for the taxes associated with the 2021 stock issuance and reimburse Mr. Schweitzer for any and all expenses he incurred during the pendency of his employment.

Based on the above, no later than 3:00pm on June 17, 2022, Mr. Schweitzer demands that funds be placed in escrow with this Firm to ensure that Mr. Schweitzer is paid the compensation he earned and negotiated with Mr. Nevels. Absent such, Mr. Schweitzer intends on filing a lawsuit against Mr. Nevels and the company for anticipatory breach of contract, as well as other claims arising from Mr. Nevels' mismanagement and improper conduct at the company.

Please note, nothing in this letter shall be deemed a waiver of any claims and such is made without any prejudice to Mr. Schweitzer.

I appreciate your time and attention to this matter. Please do not hesitate to contact me to discuss any portions of this demand.

Respectfully,

Jonathan Marc Davidoff, Esq.

cc:     Client via email
        James E. Nevels via email

Exhibit "D"



**MEMORANDUM**

Date:          June 27, 2022

To:            All Employees

From:          James E. Nevels
               Founder, Chairman & CEO

**Subject:**       **Business Closure**

Pursuant to my announcement on Tuesday, June 14, 2022, The Swarthmore Group will permanently cease operations at close of business on Thursday, June 30, 2022, due to declines in the business related to dramatic changes in the investment industry and economic conditions.

Employees may be eligible for unemployment compensation.  More information on the Commonwealth of Pennsylvania's Unemployment Compensation program, including instructions for filing benefits, can be found at https://www.uc.pa.gov.

All benefits currently provided to employees by The Swarthmore Group, including but not limited to health care insurance coverage, will terminate on Thursday, June 30, 2022.

Please direct any questions to The Swarthmore Group's counsel, Douglas G. Leney, Esq., of Archer & Greiner P.C. (dleney@archerlaw.com).

Sincerely,

James E. Nevels
Founder, Chairman & CEO

1650 Arch Street, Suite 2100 | Philadelphia, PA  19103 | 215.557.9300 | www.SwarthmoreGroup.com